**R. M. LONG et al., Plaintiffs,**

v.

**William H. AVERY, Governor of Kansas, et al., Defendants.**

**Civ. A. No. W-3220.**

United States District Court
D. Kansas.

Dec. 28, 1965.

Supplemental Opinion Feb. 23, 1966.

Ralph E. Gilchrist, Wichita, Kan., and Thomas M. Van Cleave, Jr., Kansas City, Kan., for plaintiffs.

Robert C. Londerholm, Atty. Gen. for Kansas, and Park McGee, Asst. Atty. Gen. for Kansas, for defendants.

Before HILL, Circuit Judge, and BROWN and TEMPLAR, District Judges.

TEMPLAR, District Judge.

This case was commenced June 26, 1964 by plaintiffs, as a representative action in which they seek on behalf of themselves and others similarly situated, as citizens of the State of Kansas and as duly qualified voters in the State, a determination that the provisions of Chapter 1 and Chapter 2, Laws of Kansas, Special Session of 1964 are unconstitutional and therefore invalid apportionment statutes providing for the election of members of both the Kansas State Senate and the Kansas House of Representatives. The defendants are the designated officers of the state and counties of Kansas charged with the responsibility of securing to the citizens of Kansas the equal protection of the laws and the equal right to vote as secured by the Constitution of the United States.

The plaintiffs at the time of filing their complaint in this court sought injunctive restraint against the enforcement of the state statutes, the constitutionality of which was being challenged,

and a further injunction against action of state officers charged with the duty of carrying them out. Upon consideration of the relief sought by plaintiffs, this statutory three-judge court was duly convened (28 U.S.C. §§ 2281, 2284) by order dated July 15, 1964 of the Chief Judge of the Tenth Circuit, United States Court of Appeals. There is no question of the jurisdiction of the Court or the propriety of any of the parties. The parties have stipulated to the facts and such facts constitute the entire evidence to be presented to the Court in this case.

The issues submitted to the Court for determination under the pre-trial order are as follows:

1. Do the provisions of the Kansas Constitution and Statutes providing for the establishment of both Houses of the Kansas Legislature violate the Due Process and Equal Protection clause of the Fourteenth Amendment of the Constitution of the United States?

2. Is the decision in Harris et al. v. Shanahan et al., 192 Kan. 183, 387 P.2d 771 (1963); 192 Kan. 629, 390 P.2d 772 (1964) *res judicata* on the question of the validity of the apportionment of the Kansas Senate?

3. Should this Court abstain from hearing the case at the present time?

4. Are both Houses of the Kansas Legislature, as presently apportioned, in violation of the rights guaranteed plaintiffs under the Constitution of the United States?

The plaintiffs have asked that the Court declare unconstitutional Article 2 Section 2 of the Constitution of the State of Kansas which provides in substance that each county in which at least two hundred and fifty legal votes were cast in the preceding general election shall have at least one representative in the Kansas House of Representatives. Plaintiffs have also asked that this Court hold and determine that under the Equal Protection clause of the Fourteenth Amendment to the United States Constitution, the apportionment of seats in the Kansas House of Representatives as provided by Chapter 2 of the Laws of Kansas, Special Session of 1964, is unconstitutional and invalid.

While this action was pending before the Court, the Supreme Court of Kansas filed an opinion in an original proceeding in Quo Warranto brought before that Court, Harris v. Anderson, 194 Kan. 302, 400 P.2d 25, wherein it determined and adjudged that Chapter 2 of the Session Laws, Special Session of 1964 provided for an impermissible apportionment not in accordance with the standards of equal apportionment required by the Equal Protection clause of the Fourteenth Amendment of the Federal Constitution and holding the statute so enacted by the Kansas legislature to be invalid.[1] The Kansas Court at the same time expressed the belief (p. 312, 400 P.2d 25) that the legislature would enact an apportionment act which would conform with constitutional requisites in ample time for the Secretary of State to furnish to the representative districts hereafter established, the information required to hold a valid election of membership in the Kansas House at the elections to be held in 1966.

In this belief we concur and at this time we feel that the Kansas legislature must be given the right to enact, at its earliest opportunity, a valid apportionment of the Kansas House which will comply with the Constitution of the United States.

Notwithstanding there remains to be determined the question of whether Chapter 1, Laws of Kansas, Special Session of 1964, is invalid because under the admitted and stipulated facts, including the population statistics of Kansas plaintiffs contend that there exists inequality of apportionment in the Kan-

---

1. The Kansas Supreme Court also held inoperative those portions of Article 2, Section 2 and Article 10, Section 1 of the Kansas Constitution which provided that each organized county shall have at least one representative regardless of population.

sas Senate not constitutionally permissible under the Equal Protection clause of the Fourteenth Amendment to the United States Constitution.

## SEVERABILITY OF STATE CONSTITUTIONAL PROVISION

Section 2 Article 2 of the Kansas Constitution provides in substance that the number of senators shall be regulated by law, but shall not exceed forty senators.[2]

This constitutional direction has been implemented from time to time when the Kansas legislature has enacted apportionment statutes apportioning forty senate seats within the state, the last enactment being Chapter 1, Session Laws of Kansas, Special Session of 1964. This is the Act now under attack in this case.

The Kansas Supreme Court held[3] that those portions of Article 2, Section 2 and Article 10, Section 1 of the Constitution of Kansas which provide that each organized county shall have at least one representative regardless of population, are rendered inoperative by the Equal Protection clause of the Fourteenth Amendment to the Constitution of the United States, but in so holding the Kansas Court did not nullify the portion of the state constitution providing that:

"The number of representatives and senators shall be regulated by law, but shall never exceed one hundred and twenty-five representatives and forty senators."[4]

Plaintiffs argue that the entire state constitutional provision establishing a bicameral legislature is nonseverable and that the entire constitutional foundation for legislative apportionment in Kansas is void and must be so declared by this Court.

■ If the entire state constitutional provision is to be declared void for the reason that a portion of it violates the Equal Protection clause, this must be so for the reason that the portion of Section 2 Article 2 set forth above is not severable from the remaining provisions of the Section. Where part of an amendment to a state constitution is held invalid because it violates the Fourteenth Amendment to the Federal Constitution, if the parts of the amendment are separable, the valid portions may be saved, unless it is obvious that the intent of the adopters of the amendment was to create one general scheme in an entirety, in which event, if part of the section fails, the whole must fail.[5] We should bear in mind that this contention should be considered from the position that initially in this case, the apportionment of two separate legislative bodies was attached by plaintiffs.

It is obvious that the first sentence of Section 2 Article 2 was intended to provide for the election of a bicameral legislature, the number of members to be regulated by law, with the limitation that no more than 125 House members nor more than 40 Senators should be elected in any event. The second sentence of the amendment undertook to direct that each county should have a House member regardless of population. This latter provision was contained in the second sentence and has been adjudged invalid by the Kansas Supreme Court. There was no mention of the State Senate in the invalid portion of the amendment.

2. Section 2 Article 2 reads as follows: "The number of representatives and senators shall be regulated by law, but shall never exceed one hundred and twenty-five representatives and forty senators. From and after the adoption of the amendment the house of representatives shall admit one member from each county in which at least two hundred and fifty legal votes were cast at the next preceding general election; and each organized county in which less than two hundred legal votes were cast at the next preceding general

election shall be attached to and constitute a part of the representative district of the county lying next adjacent to it on the east."

3. Harris v. Anderson, 194 Kan. 302, 311, 400 P.2d 25 (1965).

4. This section was adopted by a vote of the people as a state constitutional amendment on November 4, 1873.

5. 11 Am.Jur. Constitutional Law, Sec. 52 p. 661.

Historically, the people of the State of Kansas through their legislature and their courts, have treated the Senate and the House of Representatives as separate and separable entities, though dual in their operation. The Kansas legislature has repeatedly dealt separately with the apportionment of the House and Senate.[6] The legislative acts, the validity of which plaintiffs question by the filing of this lawsuit, were in fact separate legislative enactments. Senate Bill 2 became Chapter I and House Bill 2 became Chapter 2 of the 1964 Special Session Laws.

■ The decision of Harris v. Anderson, (supra) has clearly demonstrated that the Kansas Supreme Court considers each house of the Kansas legislature as a separate body and by its declaration in that case determined that only a portion of Section 2 Article 2 was invalid. Inferentially the Kansas Supreme Court ruled that the remaining portion (the first sentence) was a valid constitutional direction limiting the number of members that might be elected under any law the legislature might pass for that purpose. That the state may, by a constitutional provision, limit the number of legislators to be elected cannot be seriously questioned. The challenge can come only when a law or state constitutional provision relating to apportionment impairs the concept of "one man, one vote" in the operation of representative government under the Equal Protection clause.[7]

■ We hold that the first sentence of Section 2 Article 2 is valid, and that it is separable from the illegal provision set out in the second sentence of the section which relates to the distribution of seats in the House of Representatives on a per county basis without regard to population.[8] Reliance of plaintiffs on Lucas v. Forty-Fourth General Assembly of the State of Colorado, 377 U.S. 713, 84 S.Ct. 1459, 12 L.Ed.2d 632 does not sustain a different view. There a constitutional amendment was adopted by the people of Colorado, it provided in substance the legislative seats of *both* the Senate and House should be apportioned but that "[n]o county shall be divided in the formation of a senatorial or representative district." The application of this provision made impossible the proper apportionment of the Senate and it required the apportionment of both houses to be made on a basis other than population. (p. 736, 83 S.Ct. p. 1473). It was for this reason that the entire plan of apportionment of Colorado was held to be in violation of the constitutional guarantee of Equal Protection. No such limitation now exists in the valid portion of Section 2 Article 2 of the Kansas Constitution and no good reason exists for striking it down.

The same may be said of the situation in Paulsen v. Meier, 232 F.Supp. 183, relied upon by plaintiffs. There the constitutional provision of South Dakota provided that each senatorial district then existing should permanently constitute a senatorial district *and* each senatorial district should be represented by at least one representative. The South Dakota constitution not only prescribed the number of Senators and Representatives but also undertook to, and did fix, the boundaries of the sena-

---

6. House Bill No. 431 Session 1959 (Chap. 8 of 1959 Laws); House Bill No. 31 Session of 1961 (Chap. 7 Session Laws of 1961); House Bill No. 129 Session of 1963 (Chap. 203 Session Laws of 1963); Senate Bill No. 440 Session 1963 (Chap. 13 Session Laws of 1963); Senate Concurrent Resolution No. 4 Session 1963 (Chap 519 Session Laws of 1963); Senate Bill No. 2 Special Session 1964 (Chap. 1 Session Laws of 1964); Senate Concurrent Resolution No. 1 Session 1965 (Chap. 14 Session Laws of 1965).

7. See basis for rule discussed in Meeks v. Anderson (1964 D.C.Kans.) 229 F.Supp. 271 requiring that congressional districts must contain equal population "*as nearly as practicable.*"

8. The Kansas Supreme Court treated the two legislative bodies as separate entities in Harris v. Shanahan, 192 Kan. 183, 387 P.2d 771, where it declared in substance that the rationale of the Kansas apportionment plan was that the Senate should be apportioned on a basis of population and the House on a basis of both population and geography.

torial districts as well as the location of representative districts within the senatorial districts. Obviously, the constitutional system could not permit a separation of provisions applicable to the creation of senatorial districts and representative districts geographically established without regard to the controlling population factor and it was held invalid for this reason.

Nor does Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506, require a determination that Section 2 Article 2 of the Kansas Constitution be declared inseparable and therefore totally void. Actually, an examination of the decision entered by the lower court[9] discloses that in ordering reapportionment contrary to the apportionment provisions of the Alabama Constitution, the three-judge court pointedly accepted the portion of the proposed state constitutional amendment relating to the house of representatives while deciding that the senatorial provision was not acceptable by federal Equal Protection standards. This ruling was sustained by the United States Supreme Court.[10] Plaintiff's position that Reynolds sustains their view on this point is incorrect. The portion of the Kansas Constitution providing for not more than 40 Senators nor more than 125 Representatives is valid and capable of being applied to provide for constitutionally acceptable apportionment by the state legislature under standards required under the Fourteenth Amendment.

### RES JUDICATA

Defendants insist that the question of whether the Kansas Senate is constitutionally apportioned has been judicially determined by the Kansas Supreme Court in the case of Harris v. Shanahan, 192 Kan. 183, 387 P.2d 771, (December 5, 1963) and that such determination makes the question before us res judi-

cata.[11] An answer to this proposition is simply that the Kansas legislature enacted a later senatorial apportionment statute (Chap. 1, Special Session 1964) and the Kansas Supreme Court has since recognized in the light of Reynolds, the basis for earlier rulings of that Court was not consistent with the standards now declared by the United States Supreme Court under the Supremacy Clause of the United States Constitution.[12] The Kansas Court has not been called upon to determine the validity of Chapter 1, Special Session of 1964 in light of Reynolds and the later pronouncements of the United States Supreme Court. It need not be repeated that the Kansas Court, when called upon to consider the validity of Chapter 2, Special Session of 1964, did not consider its earlier decisions on the subject of apportionment to be binding upon it.

■ A state may not deprive the federal courts of the right and power to consider the validity of legislative enactments nor to review judicial decrees which involves the question of whether such action invades or upholds federally guaranteed constitutional rights.

"When a State exercises power wholly within the domain of state interest, it is insulated from federal judicial review. But such insulation is not carried over when state power is used as an instrument for circumventing a federally protected right." Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110.

■ We cannot deny access to the federal court in cases of this character where parties allege and assert that the action or proceedings taken by a state has deprived them of rights guaranteed by the federal constitution. We must therefore hold that a state court determination, if in fact one was made, which

9. Sims v. Frank, 208 F.Supp. 431 (1962).

10. Reynolds v. Sims, 377 U.S. 533, l.c. 584, 84 S.Ct. 1362, 12 L.Ed.2d 506.

11. The Act considered by the Kansas Court in Harris v. Shanahan, Chap. 13, Laws

of Kansas for 1963, later repealed by Chap. 1, Laws of Kansas, Special Session 1964.

12. Harris v. Anderson, 194 Kan. 302, l.c. 310, 400 P.2d 25.

in this instance does not appear to be so, is not *res judicata* of the issue before us.

## SHOULD COURT ABSTAIN FROM HEARING CASE

The defendants urge that this Court should abstain from proceeding with the case under the doctrine of "abstention" in order to afford the Kansas Court, as a matter of comity, an opportunity to consider the issue involved. Defendants urge that plaintiffs have a plain and adequate remedy in the Kansas courts and that it has been pursued by the class plaintiffs represented here. Defendants speculate that appeals may be taken from the Kansas courts' decisions and that multiplicity of litigation might be avoided if the matter were left to the state court for determination. We are aware of no action pending in the state court on the issue before us and the existence of such proceeding has not been called to our attention. We must conclude that no such action has been brought in a state court. Furthermore, the doctrine of abstention under which this Court may decline to exercise or postpone the exercise of its jurisdiction, is an extraordinary and narrow exception to duty of the district court to adjudicate a controversy properly before it. The abdication of our obligation to decide cases can be justified only in exceptional circumstances. Where the matter before the Court is so enmeshed with federal questions in determining validity and constitutionality of state law or action, we may, in the exercise of discretion, proceed to hear and determine the matter. This is particularly proper when no similar action is before a state court and the element of time makes imperative the prompt adjudication of the issue from the standpoint of federal constitutional rights involved.

The rule of abstention is applicable only where relevant state law is uncertain.[13] Defendants contend in this case that the Kansas Supreme Court has passed upon the validity of the act under challenge and raise as a defense the plea of *res judicata*. Under such circumstances defendants are in no position to urge the doctrine of abstention. Furthermore, there is no interpretation that could be placed on the question before us by the state court that would foreclose application of the constitutional issue which must be applied. There is not an issue of state law here the settlement of which might be determinative of the case.

We have jurisdiction and the duty to act is, in this case, established without question in Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663, where the United States Supreme Court concluded in response to similar contentions raised in that case that

1. the District Court had jurisdiction of the subject matter of the federal constitutional claim asserted in the complaint; and

2. the complaint's allegations of a denial of equal protection presented a justiciable constitutional cause of action upon which plaintiffs are entitled to a trial and decision.

We hold that the doctrine of abstention is not applicable here.

Does Chapter 1, Laws of 1964, Special Session, provide for a constitutional apportionment of the Kansas Senate.

The first and fourth issues as stipulated by the parties will now be considered.

This action was instituted for the purpose of challenging the validity of two separate apportionment acts of the Kansas Legislature.[14] But the Kansas Su-

---

13. City of Meridan v. Southern Bell, 358 U.S. 639, 79 S.Ct. 455, 3 L.Ed.2d 562; Harrison v. NAACP, 360 U.S. 167, 79 S. Ct. 1025, 3 L.Ed.2d 1152; See West Virginia Law Review, Vol. 65 p. 109.

14. Chapter 1 and Chapter 2 of Special Session 1964.

preme Court, in an action brought only to question the legislative apportionment of the House of Representatives, has determined the apportionment of the House was indeed unconstitutional.[15] Thus, the only matter left for disposition is the question of the constitutionality of the senatorial apportionment as prescribed by the state legislature by Chapter 1.

We consider this remaining proposition without regard to the malapportionment of the Kansas House. As heretofore determined, the Kansas courts and the legislature have always treated the two bodies of the legislature as separate and distinct legal entities. We measure the legislative apportionment of the Senate as a distinctly separate proposition to be appraised by the constitutional standards prescribed for us to follow.

It may appear that this position is contrary to the rule announced in Maryland Committee v. Tawes, 377 U.S. 656, 84 S.Ct. 1429, 12 L.Ed.2d 595, but in that case the apportionment of the General Assembly (House of Representatives) was not questioned, while here, the apportionment of the House has been declared void. The factual background of *Maryland* make its rule inapplicable here.

We suffer from a social, or ethic, and an historical lethargy. Consequently, it is well to be reminded that:

"No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusionary if the right to vote is undermined. Our Constitution leaves no room for classification of people in a way that unnecessarily abridges this right."

Wesberry v. Sanders, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481.

 The Court in *Reynolds* adopted the principle of *Wesberry* in requiring equal representation for equal numbers of people. Indeed, the Court sets forth a principle so axiomatic that it has been and is often forgotten that legislatures represent people, not trees, acres, farms, cities or economic or social interests.

The holding of the Supreme Court in *Reynolds* set forth the basic principles for the consideration of apportionment cases.[16]

 The following basic principles were announced in *Reynolds*:

1. Each citizen has an inalienable right to full and effective participation in the political processes of state's legislatures and this requires that each citizen has an equally effective choice in the election of members of a state legislature.

2. A majority of the people of a state should be able to elect a majority of the state's legislature.

3. The purpose of legislative apportionment is to achieve fair and effective representation for all citizens.

4. Population is, of necessity, the starting point for consideration and the controlling criteria for judgment in legislative apportionment controversies.

5. The Equal Protection clause "demands no less than substantially equal state legislative representation for all citizens of all places as well as of all races."

 After establishing the basic principles the Court held:

1. The Equal Protection clause "requires that the seats in both Houses of a bicameral state legislature must be apportioned on a population basis."

2. The state cannot justify apportionment of one house by population and the other house by either geographic or a combination of population and geography by reference to Congress or the "federal analogy."

3. "With respect to the operation of the Equal Protection clause it makes

---

15. Harris v. Anderson, 194 Kan. 302, 400 P.2d 25.

16. We use the term "apportionment" in its broad sense to cover not only the distribution of legislative seats but also to cover districting as that term applies to geographic boundaries.

no difference whether a state's apportionment scheme is embodied in its constitution or in statutory provisions."

4. What may be permissible in one state may be unsatisfactory in another depending upon the particular facts and circumstances.

 The Court then set out the following general guidelines:

1. "[A] state may legitimately desire to maintain the integrity of various political subdivisions, insofar as possible, and provide for compact districts of contiguous territory in designing a legislative apportionment scheme, valid considerations may underlie such aims."

2. "[S]o long as the divergencies from a strict population standard are based on legitimate considerations incident to the effectuation of a rational state policy, some deviations from the equal-population principle are constitutionally permissible with respect to the apportionment of seats in either or both of the two houses of a bicameral state legislature."

 But, the foregoing guidelines are limited in application by the following rules:

(a) "[N]either history alone, nor economic or other sorts of group interests, are permissible factors in attempting to justify disparities from population-based representation."

(b) "[C]onsiderations of area alone, provide an insufficient justification for deviations from the equal-population principle," and

(c) "A consideration for justifying deviation that 'appears to be of more substance' is 'that of insuring some voice to political subdivisions as political subdivisions.'"

3. "[C]areful judicial scrutiny must of course be given, in evaluating state apportionment schemes, to the character as well as the degree of deviations from a strict population basis."

4. A state plan to be reasonable, must provide for periodic adjustments and the Court indicated that ten years is not a constitutional requisite but it meets minimal standards.

 The responsibility of federal courts was outlined as follows:

1. "[I]t would be the unusual case in which a Court would be justified in not taking appropriate action to insure that no further elections are conducted under the invalid plan."

2. In awarding or withholding "immediate relief" the court should consider proximity of forthcoming elections and mechanics of state election laws and should act and rely on equitable principles.

3. Legislative reapportionment is primarily a matter for legislative consideration: judicial relief is appropriate only when a legislature fails to reapportion according to federal constitutional requisites in timely fashion after having an adequate opportunity to do so.

Additional significant guide lines have been set forth by the Supreme Court which clarify our views here.

 We believe that the effect of the apportionment decisions of the Supreme Court requires that both houses of a state legislature be apportioned substantially on a population basis. The Court has rejected the "federal analogy" suggestion that one house of a state legislature be apportioned on population and the other house be apportioned on area or other factors. Also rejected was the proposition that because they are small in population some significant geographic or economic interests might permit some deviation from the established rule.

The extent to which the Court has applied the "population only" test is disclosed in the case of Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) where it was said at page 567, 84 S.Ct. at page 1384 that:

"[p]opulation is, of necessity, the starting point for consideration and the controlling criterion for judgment in legislative apportionment controversies."

Then the Court discussed other factors which had been used in apportionment plans, including political subdivision, which it described as a consideration of more substance in justifying deviation from the population test, but finally concluded that "if, even as a result of a clearly rational state policy of according some legislative representation to political subdivsions, population is submerged as the controlling consideration in the apportionment", then the apportionment would be unconstitutional.

Defendants urge that the Supreme Court has significantly withdrawn from the principle of equally weighted votes by its holding in Fortson v. Dorsey, 379 U.S. 433, 85 S.Ct. 498, 13 L.Ed.2d 401 (1965). Clearly a different factual situation was presented in *Fortson*. There the legislature of Georgia had apportioned the state Senate on the basis of population but in doing so had provided that in the case of "Senators from those senatorial districts consisting of less than one county shall be elected by all the voters of the county in which such senatorial district is located." This provision was attached as being invidious discrimination and that it reduces the voters of a senatorial district to only a fraction of a vote for their own senator. The Supreme Court sustained the apportionment and held that Equal Protection does not necessarily require formation of all single-member districts in a State's legislative apportionment scheme. But this situation does not exist in the Kansas Senatorial law now being scrutinized. In *Fortson,* the Court clearly reaffirmed the *rule* in *Reynolds,* by declaring: (p. 436, 85 S.Ct. at p. 500)

"Only last Term, in our opinion in Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506, decided after the decision below, we rejected the notion that equal protection necessarily requires the formation of single-member districts. In discussing the impact on bicarmeralism of the equal-protection standards, we said, 'One body could be composed of single-member districts while the other could have *at least some* multi-member districts.' 377 U.S., at 577, 84 S.Ct. at 1389. (Emphasis supplied.) Again, in holding that a State might legitimately desire to maintain the integrity of various political subdivisions, such as counties, we said: 'Single-member districts may be the rule in one State, while another State might desire to achieve some flexibility by creating multimember or floterial districts. *Whatever the means of accomplishment, the overriding objective must be substantial equality of population among the various districts, so that the vote of any citizen is approximately equal in weight to that of any other citizen in the State.*' 377 U.S. at 579, 84 S.Ct. at 1390. (Emphasis supplied.)

With this declaration before us we now analyse the apportionment plan set forth in Chapter 1 of the 1964 Special Session laws of Kansas.

The State of Kansas is divided in many political subdivisions. (We use the term "political subdivisions" as referring to a settled system of governmental administration.) The election machinery of Kansas is geared to provide for election of senators (and House members as well) through the counties as political subdivisions. Nomination papers for Senators whose district is composed of one county or less files them with the County Clerk of the County. Nomination papers for political offices where the district embraces more than one county must be filed in at least one-half of the counties in the district. The State Board of Canvassers must certify to the Secretary of State a list of candidates whose districts include more than one county and the Secretary must certify to the County Clerk of each county the names and addresses of the persons to be placed on primary election ballots and the County Clerk must arrange for the preparation and distribution of ballots, Article 2, Chapter 25, K.S.A. Party organizations are organized using the county committees as the basic political organization, K.S.A. 25–220. A survey

of Kansas election laws is most persuasive that the counties are established as the primary political subdivisions of the state.

The Kansas Legislature at the 1964 Special Session, apportioned the Kansas Senate into 40 districts. These districts, the population of such districts and the population of the counties are shown in Appendix "A" which is by reference included herein.

In summary the districts from which each of the 40 senators is elected do not in several instances systematically follow county lines, and range in population from 61,920 in District No. 9 to 47,114 in District No. 28, a variance of 14,806. In fact, there is no showing of any systematic plan recognizing county lines or a showing why county lines were not followed.

The evidence submitted to us with the stipulation of the parties and the pretrial order discloses that it is possible, if no significance is given to county lines, for the Legislature to apportion the senatorial districts in a manner which would permit each senatorial district to consist of an average population per senator in which the largest district would have approximately 56,000 and the smallest approximately 53,000. Actually, if political subdivisions are ignored, senatorial districts could be formed with population substantially equal in each of the districts. We note also that as presently apportioned, and based on population figures placed on Appendix A, the "ideal" Kansas senatorial district would be composed of 54,307 persons (¼₀ of state population).

 The foregoing outlines the factual situation to which we must apply the law as declared by the United States Supreme Court. As noted, under Chapter 1, Laws of Kansas Special Session of 1964, the apportionment statute now in

force governing the election of Kansas Senators, voters in District 28 have approximately 30% more voting strength in electing their senator than do the voters of District 9. In adopting this apportionment statute, county lines were ignored in a substantial number of instances to such an extent that the plan or pattern manifested an intention to disregard them. Where a state legislature undertakes a plan of reapportionment which ignores political subdivision lines, it is not permissible in effectuating a rationale for State policy to deviate from the equal population principle in either or both houses of a state legislature.[17] We must hold under these circumstances and following the rules and guidelines declared by the Supreme Court, that the following state policies are insufficient to justify population disparities between districts, to-wit: according recognition to a state's heterogeneous characteristics; balancing urban and rural power in a legislature; insuring effective representation for sparsely settled areas; protecting "insular minorities"; preventing districts from becoming so large as to limit the accessibility of representatives to their constituents and other sorts of group interests; taking geographical or topographic considerations into account; giving greater representation to permanent residents than to temporary residents, such as military and military-related personnel; or giving effect to history or tradition.

 Under the rules prescribed in *Reynolds* we hold that the plan of apportionment of the Kansas Senate, set forth in Chapter 1, Special Session 1964 denies the concept of "one man, one vote" in the state and violates the Due Process and Equal Protection provisions of the Fourteenth Amendment to the Constitution of the United States.[18]

17. Reynolds v. Sims, and other cases decided.

18. Some deviation from population based representation in state legislatures may be considered in insuring some voice to political subdivisions, as political subdivi-

The plaintiffs here seek injunctive relief, as indeed they may in this equitable action. In the posture of the facts in this case we believe we should "stay our hand." The State Supreme Court has retained jurisdiction in the Harris-Anderson case in which Chapter 2 of the 1964 Special Session laws was held invalid and that Court afforded the legislature as presently composed an opportunity to adopt a valid apportionment plan for the House.

In Roman v. Sincock, 377 U.S. 695, 84 S.Ct. 1449, 12 L.Ed.2d 620, the United States Supreme Court approved as "wise and temperate" the action of the United States District Court giving the state an opportunity to adopt a plan, until after general elections when such elections were imminent. The Court also disapproved of the effort of the lower court to state in mathematical language the constitutionally permissible boundaries of discretion in deviating from populationed-based apportionment. The Court said,

"[I]n our view the problem does not lend itself to any such uniform formula, and it is neither practicable nor desirable to establish right mathematical standards for evaluating the constitutional validity of a state legislative apportionment scheme under the Equal Protection Clause. Rather, the proper judicial approach is to ascertain whether, under the particular circumstances existing in the individual State whose legislative apportionment is at issue, there has been a faithful adherence to a plan of population-based representation, with such minor deviations only

as may occur in recognizing certain factors that are free from any taint of arbitrariness or discrimination."

The Federal Courts are always open to the people of this country for the protection of their constitutional rights. This Court must promptly respond with corrective process to the valid contentions of citizens that their constitutionally guaranteed rights are being denied them by any plan of legislative reapportionment which results in arbitrary classification or unreasonabe departure from the equal representation requirement of the Fourteenth Amendment.

We now determine that injunctive relief should be withheld until the Kansas legislature, as now apportioned has an opportunity to enact legislation conforming to the principles announced by the Supreme Court of the United States as interpreted in this opinion and to a date which will afford the Secretary of the State of Kansas ample time to comply with the provisions of K.S.A. 25–204 prior to the primary elections of 1966.[19]

Prevailing counsel will prepare, circulate and submit an appropriate order adjudging Chapter 1 of the 1964 Special Sessions laws of Kansas invalid and that under its provisions the Kansas Senate was malapportioned under requirements of the Equal Protection clause of the Fourteenth Amendment of the Constitution of the United States. Such decree shall provide that the effective date of the decree shall be stayed until the 1st day of April, 1966 and that the Court retains jurisdiction to consider and grant any further relief that may be justified or required by the facts and circumstances then existing.

sions. In at least one body of the state legislature, political subdivisions may be accorded some independent representation as long as the basic standard of equality among districts is maintained. Needs for enactment of so-called local legislation, concerning only local political subdivisions, the legitimate desire to construct districts along political subdivision lines will permit a degree of variation in the size of the district, but the controlling consideration must be that in the apportionment of seats in a particular legislative body,

that the right of the state's citizens to cast an effective adequately weighed vote must not be constitutionally impaired. (Reynolds v. Sims.)

19. K.S.A. 25–204 provides in pertinent part that on or before April second in even numbered years before the time of holding the primary, the Secretary of State shall prepare and transmit to each County Clerk a notice in writing, designating the offices for which candidates are to be nominated at such primary.

APPENDIX A

APPORTIONMENT OF KANSAS SENATE, 40 DISTRICTS, PROPOSED BY SENATE BILL 2 , 1964 SPECIAL SESSION

Average Population per District - 54,307 (Population divided by 40)

1963 Annual Census, State Board of Agriculture
State Total -- 2,172,296

2/19/64

LEGEND: Encircled figure is the number of the district.
District population is underscored.
1963 county population is shown under name of county.

APPENDIX "A"

## Supplemental Opinion

On December 28, 1965, this Court filed an opinion and decision determining that Chapter 1, Laws of Kansas, Special Session of 1964 was an invalid apportionment of State Senatorial Districts in Kansas and directing that the effective date of the decree be stayed until April, 1966, and further providing that the Court retain jurisdiction to consider and grant any further relief that may be justified or required by the facts and circumstances then existing.

Immediately thereafter, the Kansas Attorney General filed on behalf of the respondents representing the interests of the State of Kansas, a pleading denominated as a "Motion for Clarification" of this Court's judgment. We treat this motion as a "motion to modify judgment" since we believe the original decision of the Court is quite definite and requires no clarification. The decision is, nevertheless, subject to modification.

The pertinent allegations of the respondents' motion are set forth as follows:

"1. The Court, in its opinion, determined only that Chapter 1 of Laws of the 1964 Kansas Special Session is unconstitutional. That statute deals only with the Kansas senatorial districts.

2. The Court further determined that the injunctive relief sought in the complaint herein should be withheld until the presently constituted Kansas Legislature had an opportunity to enact valid apportionment statutes. In so holding, the Court referred to 'a date which will give the Secretary of the State of Kansas ample time to comply with the provisions of K.S.A. 25–204 prior to the primary elections of 1966.'

3. Article 2, Section 29 of the Kansas Constitution provides that senators shall be elected every four years commencing in 1876.

4. In accordance with that provision, the last election of senators was the general election held on November 3, 1964. Accordingly, the next regular election of senators will take place on November 5, 1968.

5. The above noted reference in the Court's opinion to the election of 1966 raises the question whether the Court contemplates that a senatorial election will take place in that year. A resolution of this question is necessary so that the defendants and the other officers and people of the State of Kansas may comply with the decision of the Court.

6. Counsel for defendants are aware of no authority for the present legislature to shorten the terms of its members and provide for their election other than at the intervals prescribed in the Kansas Constitution, except by Court order."

Respondents then request in effect that this Court determine that the terms of the present members of the Kansas Senate shall terminate at the end of the four year period for which they were elected. Following the filing of this motion this Court reconvened and heard oral arguments from both sides in the case. Thereafter, the Court has fully considered the contentions advanced and has taken the time to review the numerous decisions from other jurisdictions in which patterns have been constructed to provide for the proper and equitable implementation of reapportionment procedures after a determination of invalidity has been made.

Statements having relevance to our problem are hereafter indicated:

We should not permit another election of State Senators under the existing unconstitutional Senatorial apportionment statute. Maryland v. Tawes, 377 U.S. 656, 676, 84 S.Ct. 1429, 12 L.Ed.2d 595. The State was restrained from conducting future elections under void statute in Scranton v. Drew, 379 U.S. 40, 85 S.Ct. 207, 13 L.Ed.2d 107. In Scott v. Germano, 381 U.S. 407, 85 S.Ct. 1525, 14 L.Ed.2d 477, it seems to be the attitude of the U. S. Supreme Court that a District Court should "stay its hand" and afford a state an opportunity to take appropriate action so that election of members of the state senate might be

accomplished "in accordance with the provisions of the [Illinois] election laws."

Reynolds v. Sims, 377 U.S. 533, 585, 84 S.Ct. 1362, 1394, 12 L.Ed.2d 506, declares that once a State's legislative scheme has been found to be unconstitutional, "equitable considerations might justify a Court in withholding the granting of immediately effective relief" even though the existing scheme was found invalid. We further observed in that case that "[A] court is entitled to and should consider the proximity of a forthcoming election and the mechanics and complexities of state election laws, and should act and rely upon general equitable principles."

It is clear that by Reynolds v. Sims the U. S. Supreme Court emphasized the philosophy that the responsibility of proper reapportionment rests with the legislature and that the principle objective of the courts should be that when an apportionment statute is unconstitutional, the Court's responsibility extends only to preventing the holding of further elections under such a void statute. We are repeatedly admonished to act with proper judicial restraint.

The Court in Thigpen v. Meyers, 231 F.Supp. 938 (Wash.) went so far as to modify an original order forbidding the holding of elections under void statutes and permitted a legislature to be elected because of equitable principles. That a legislative assembly, though elected under a law declared unconstitutional, still has de facto status was held in Paulson v. Meier, 232 F.Supp. 183 (N.D.)

The Oklahoma apportionment case, Reynolds v. State Election Board, 233 F.Supp. 323 held only that no more elections could be held under the statutes which that Court declared to be unconstitutional and directed that elections thereafter held must be in conformity with both the Oklahoma and Federal constitutions.

It has been suggested that the Court should exercise its powers only in furtherance of the public good after deliberate consideration of the total equities inherent in the problem (Petusky v. Clyde, 234 F.Supp. 960, Utah). The people can best be served by withholding any immediate affirmative relief in order to allow the legislature to give its consideration to the problem at the first opportunity.

The relief required in the Minnesota case (236 F.Supp. 820) was to withhold injunctive relief and give the legislature an opportunity to enact a valid statute at its next *regular* session.

In Mann v. Davis, D.C., 238 F.Supp. 458, the Federal Court in Virginia approved the proposition that the Court should refrain from taking action that might leave a state without a legislative body that could not act during the period of time following the annulling of its apportionment act and the date of holding a subsequent election. An emergency could well prove dangerous to the effective administration of government.

■ There is another consideration to which my attention is challenged. The governor has just called a special session of the existing Kansas legislature for the announced purpose of enacting such apportionment statutes as may be necessary or required. Of this fact we take judicial notice.

Under decree of State Supreme Court, the Kansas House of Representatives must be reapportioned before April 1, 1966. Presumably, this will be done in the manner required by law so that another House will not be elected under void statute.[1] Such action will make vast changes in the political representation of Kansas communities. It will equalize the voting power of the population of the state.

The cases reviewed seem to hold that the Courts should not permit *another election* to be held under a void statute; that the legislature should be given an opportunity at the next *regular* session to consider and enact a valid apportionment statute, and that consideration

---

1. Chap. 2, Laws of 1964, Kansas Special Session.

should be given to the mechanics and complexities of state election laws and that general equitable principles should be relied upon. It is true that the destruction of senatorial terms before the terms are half finished will prove disruptive of many auxiliary official agencies composed of Senate members appointed for a term contemporaneous with the elected period.

■ The present membership of the Kansas legislature is composed of two separate houses as provided by the Kansas Constitution.[2] The Kansas Supreme Court has held unconstitutional the House apportionment statute[3] for the reason that it permitted the dilution of the weight of votes because of place of residence and impaired basic constitutional rights guaranteed by the Equal Protection Clause of the Fourteenth Amendment. The facts established and relied on by the Kansas Supreme Court in its opinion in *Harris* disclose a wide and invidious discrimination as to population in the Kansas House at this time. Such discrimination will continue until a valid apportionment statute is enacted by the Kansas legislature and an election held under it in 1966. To require the legislature as presently constituted in both its branches to enact a statute validly apportioning the Kansas Senate might very well compound the serious evil that has been held to exist because of serious malapportionment of the Kansas House of Representatives. Under constitutional guarantees upheld by the Kansas Supreme Court in *Harris*, it would be unwise, if not unjust to permit the present Kansas House of Representatives to influence, if not dominate, the apportionment of the Kansas Senate. This is not to say that the Kansas legislature may not act any time it elects to do so, in enacting a valid Senatorial apportionment law, we only say it should not be required to do so before the next *regular* session of the legislature which

will be held under state constitutional provisions beginning in January, 1967.[4]

Upon reconsideration of the court decisions herein noted which have fashioned orders based on equitable considerations and principles designed to insure that there will be equal representation afforded in state legislatures, we have concluded that we are justified in modifying our original order to the extent that the Kansas legislature would be afforded an opportunity at its next *regular* session, held in 1967, to validly apportion the State Senate so that the next Senate elected would conform to the standards now required to afford equal representation of the people. Thus we will not permit another Senate to be elected under an invalid statute. We avoid the participation in a new apportionment by an invidiously apportioned House of Representatives and we avoid nullification of the terms of 40 Senators elected under a statute of reapportionment enacted in 1964 by a legislature presumably acting in good faith but now in light of later pronouncements of the law, found to be invalid. Furthermore we eliminate the possibility that continuity of government might be impaired and the likelihood of causing any disruption, harassment or embarrassment to the installed apparatus of state government, thus fostering and preserving a compatible Federal-State relationship most desirable at all times.

We further hold and direct that after the Kansas legislature has enacted a constitutionally valid Senatorial reapportionment statute, and not before then, and during the interval between its adoption and the commencement of the terms of the Senators chosen at the 1968 elections, the Senate should not be restrained from considering and passing such legislation as it considers to be in the public interest. If the present Senate could not act during this interim, there would be no legislature available to act should

2. Article 2, Section 1, Kans.Const.

3. Harris v. Anderson, 194 Kan. 302, 400 P.2d 25.

4. Article 2, Section 25, Kans.Const.

an emergency require it. For the reasons set forth above, and because we feel that general principles of equity supported by decisions of the Supreme Court authorizes such an order, we hold that the present State Senate should be permitted to a continuance of its powers during the current term for which the members of the State Senate were elected.

We again affirm our view that the details of legislative redistricting is basically and primarily a legislative responsibility. We endeavored to list, in our original decision, those standards announced by the U. S. Supreme Court in its opinions on the subject. We emphasize and repeat, for what assistance it may provide, that among the established guidelines are the following: substantially equal legislative representation is the base; mathematical exactness is not a workable constitutional requirement; there may be present an element, but not the governing one, resting upon the integrity of political subdivisions and other legitimate considerations incident to the effectuation of a rational state policy; this element, however, must be free from arbitrariness or discrimination; neither history alone, nor economic or other group interests are factors which justify disparities from population-based representation; political subdivisions may be accorded some independent representation in at least one house so long as the basic standard of equality of population among districts is maintained; weighting of votes according to residence is discriminatory; and there must be no "built-in bias".

Reapportionment is a problem common to nearly all of the states today. Many are going through the throes of reapportionment in one way or another. Kansas is not alone. We are confident the legislature of Kansas will at the proper time, effectively and constitutionally carry out its obligations and responsibilities. It has been suggested that in theory, at least, it is possible, if the country to city trends continue to the extreme, for a state conceivably to be reduced to only one legislative district for its territory apart from its metropolitan areas, and with all the remaining districts in the cities. This, however is a problem to be considered and resolved on another day.[5]

The order of December 28, 1965 should be modified to stay its effectiveness until April 1, 1968. This Court will, under authority of Scott v. Germano, 381 U.S. 407, 409, 85 S.Ct. 1525, 14 L.Ed.2d 477, retain jurisdiction of the case and in the event a valid reapportionment plan for the State Senate is not adopted by the Kansas legislature prior to April 1, 1968 it will enter such orders as it deems appropriate, including, if necessary, an order for a valid reapportionment plan or an order directing that its members be elected at large pending a valid reapportionment by the State itself.

It is so ordered.

HILL, Circuit Judge, concurs.

WESLEY E. BROWN, District Judge, would deny the motion to extend the effective date of the decree under the controlling Supreme Court decisions.

5. Honsey v. Donovan, 236 F.Supp. 8, 22.