CHRISTOPHER JACKMAN, *ET AL.*, PLAINTIFFS-APPEL-
LANTS, v. JOHN M. BODINE, *ET AL.*, DEFENDANTS-
RESPONDENTS. JOSEPH J. MARAZITI AND BRYANT
BARB, INTERVENORS.

Argued April 23, 1965—Decided April 23, 1965.

*Mr. Robert P. Hanley* argued the cause for intervenor Joseph J. Maraziti.

*Mr. Louis Sherman* argued the cause for intervenor Bryant Barb.

*Mr. Vincent P. Biunno* argued the cause for President of the Senate (*Mr. William M. Lanning* and *Mr. H. Arthur Smith, Jr.*, of counsel; *Mr. Archibald S. Alexander, Jr.*, on the brief).

*Mr. Sidney P. McCord, Jr.* argued the cause for Speaker of the House of Assembly.

*Mr. Arthur J. Sills*, Attorney General, argued the cause for Secretary of State (*Mr. Alan B. Handler*, First Assistant Attorney General, of counsel).

*Mr. David Friedland* argued the cause for plaintiffs (*Messrs. Friedland, Schneider & Friedland*, attorneys).

PER CURIAM. In our first opinion in this cause we held that the Legislature of the State of New Jersey was invalidly constituted under the doctrine of *Reynolds v. Sims*, 477 *U. S.* 533, 84 *S. Ct.* 1362, 12 *L. Ed. 2d* 506 (1964), but held that the Legislature, although thus malapportioned, had the power by virtue of necessity to enact a statute for the temporary reapportionment of that branch of the government, 43 *N. J.* 453 (1964). We retained jurisdiction over the controversy to the end that applications could be made in the cause for the

resolution of issues left open and all issues raised by such statutes as the Legislature might pass. On March 31, 1965 we filed a second opinion in this cause, 44 *N. J.* 312, in which we denied an application for extension of time for the enactment of a temporary reapportionment act and in the course of that opinion indicated that the General Assembly as now constituted was acceptably apportioned for the purposes of a temporary plan. Thereafter the Legislature adopted *Chapter* 19 of the *Laws of* 1965, *N. J. S. A.* 52:10B–1 *et seq.*, which continued the present apportionment of the General Assembly and established an interim plan for the Senate. The statute contemplates an election in November of this year for both houses, the terms to run for a period of two years, this in accordance with our first opinion wherein we held that the Legislature to be elected in November 1965 could continue in office for a period determined as set forth in that opinion and in any event not beyond the second Tuesday of January 1968.

Thereupon motions were made on behalf of Joseph J. Maraziti and Bryant Barb for leave to intervene and for a judgment declaring the new statute to be invalid in whole or in part. The applications to intervene were granted and argument was this day had upon the issues so presented.

The statute provides that the Senate shall be composed of 29 members to be elected from 14 Senate districts. The districts are created on the basis of existing county lines. Some of the districts consist of a single county with allocations to such counties of one to four Senators depending upon population. Five of the districts consist of more than one county. One Senator is allocated to two of those districts, again on the basis of the population, and as to the remaining three multi-county districts two Senators are allocated to each, again on the basis of population. With respect to the multi-county districts to which two Senators are allocated, section 5 of the statute provides that "Where any Senate district is comprised of two or more counties and is entitled to two members of the Senate, no political party shall nominate more than one candidate from among the residents of any one

county." We note the restriction relates solely to the nomination of a political party and does not prevent the election at the general election of two Senators from any one of the constituent counties.

Intervenor Barb charges that the basic plan of the allocation of 29 members among the 14 districts cannot be reconciled with the doctrine of "one person—one vote" announced in *Reynolds v. Sims, supra,* and contends further that the provisions of section 5 are in any event invalid under the said doctrine, claiming that the restriction upon the nomination by a political party operates in practical effect to insure the election of one member of the Senate from a county with a population far below the representative ratio. Intervenor Maraziti, who does not question the basic plan of the statute, does however advance the same attack upon section 5.

In approaching the issues in this matter, we are mindful that we are dealing with a plan for the temporary reapportionment of the Legislature rather than its permanent structure. We appreciate also the practical problems involved in making a transition from the historical representative pattern in this State to one in which each county will no longer have an equal vote in one of the houses.

With respect to the first issue mentioned above, that the basic design of *chapter* 19 violates the doctrine of *Reynolds v. Sims,* we note that that case recognized the propriety of taking into account existing county lines in forming legislative election districts, provided the plan does not submerge the primary concept of equality of vote. If such lines are used, obviously the districts cannot be of equal population, and the deviations are likely to be larger than those incidental to the creation of original districts indifferent to existing or other political subdivisions. Such inequality as may be unavoidable because of the use of county lines may be offset by other considerations. One is that the drawing of original lines involves the problem of gerrymandering. Another is that counties do represent existing political, governmental and economic interests and thus constitute effective units for

representational purposes. In our first opinion we noted the importance of the county in the political and economic life of our State, 43 *N. J.*, at *pp.* 462–463.

In indicating in our second opinion in this cause that the General Assembly as now constituted could continue for temporary purposes, we had in mind that while the deviations might well be too great in a permanent plan, those deviations would be tolerable in a transitional one,[1] if the total temporary plan were compatible with the objective of *Reynolds v. Sims*. In dealing with *chapter* 19 we are mindful that the constitutional issue must be considered in that framework.

With respect to the Senate, *chapter* 19 allocates the 29 members among 14 Senate districts on a mathematical basis the validity of which no one contests. The formula is commonly known as the equal proportions method and is the one used in the allocation of the 60 members of the Assembly among the 21 counties following our decision in *Asbury Park*

---

[1] We said in our first opinion, 43 *N. J.*, at *p.* 460, *fn.* 1:

"*Reynolds v. Sims* recognized the propriety of using existing counties with an assurance of a minimum of one member to a county, provided the counties are not so numerous and so sparsely settled as to scuttle the population approach in apportionment. 377 *U. S.* 533, 84 *S. Ct.* 1362, 12 *L. Ed. 2d*, at *pp.* 537–538.

The present attack upon the General Assembly emphasizes that 21 of 60 seats are allocated without regard to population, a mode of expression which tends to accentuate the imbalance. The Attorney General replies that of the five counties which have less than the representative ratio, three have more than one-half a ratio and the other two are just short of that fraction; that the population of those five counties, if aggregated, would be entitled to 2.71 seats in the General Assembly, so that the allocation of five seats to those counties means that only 2.29 seats out of 60, less than 4%, are required to be apportioned differently from a strict population basis.

Upon the reapportionment in 1962, based on the 1960 census, the average relative population deviation from the theoretical representative ratio was 20.2%; the ratio between the largest and smallest constituencies was 2.96; and the minimum percentage of population in counties theoretically electing a majority of assemblymen was 46.5. *Reock, op. cit. supra*, [*Population Inequality among Counties in the New Jersey Legislature*], *p.* 11. These figures reflect the impact of the five small counties, rather than the experience as among themselves of the 16 counties which share the remaining 55 seats."

*Press, Inc. v. Woolley,* 33 *N. J.* 1 (1960). The criticism leveled against *chapter* 19 is that, notwithstanding compliance with the mathematical formula, the resulting distribution is marked by disparities in representation beyond those which *Reynolds v. Sims* would permit.

The representative ratio is 209,199. The maximum relative deviation from the ideal representation figure per Senator is an under-representation of 27.3% in one district and an over-representation of 20.9% in another district, but in only four of the 14 districts does the deviation one way or the other exceed 10.6%. The average weighted deviation for all 14 districts is 9.4%. The ratio between the largest and the smallest population per seat is 1.61 to 1.00. The minimum percentage of population which can elect a bare majority of the Senate is 47 plus.

The Attorney General points out that with respect to five counties where over-representation or under-representation exists in one house by more than 15%, there is partially offsetting under-representation or over-representation in the other house. Overall, the combined average relative deviation of the two houses would be 5.7%, and in only two of the districts would the figure exceed 9.8%, *i. e.* minus 15.8% and minus 19%.

As we said earlier the single question before us is whether the foregoing distribution will satisfy the demands of *Reynolds v. Sims* for the purpose of a temporary Legislature. While we recognize room for dispute, we are persuaded that *chapter* 19 is constitutional for such temporary purpose.

In view of the suggestion made during the oral argument that our approval of *chapter* 19 might be construed to forecast the view that a like arrangement would be acceptable for permanent purposes, we re-emphasize that we are dealing only with the sufficiency of the plan for interim purposes and nothing contained herein should be deemed to suggest that we would find it suitable as a permanent arrangement.

We turn then to the question whether the residence requirement of section 5 is valid. The parties refer to the

decision of the U. S. Supreme Court in *Fortson v. Dorsey,*
379 *U. S.* 433, 85 *S. Ct.* 498, 13 *L. Ed. 2d* 401 (1965). There
the State of Georgia was divided into 54 senatorial districts
of substantially equal population. With respect to those coun-
ties in which there were more than one senatorial district, the
statute provided for the election of the senators at large
within the entire county. Each Senator, although elected
county-wide, had to be a resident of the district to be repre-
sented by him. The Supreme Court sustained this arrange-
ment as satisfying the principle of "one person, one vote" in
the absence of a showing that the plan was designed to serve
some invidious end.

*Chapter* 19 differs factually from the statute sustained in
*Fortson* in two respects. One is that the districts involved
in *Fortson* were substantially equal in population, whereas
the counties within the multi-county districts created by
*chapter* 19 are not of equal population. The other difference
is that whereas in *Fortson* only a resident could be elected
from the district, *chapter* 19 would permit the election of two
Senators from any one of the constituent counties of the
senatorial district. We have no doubt that the purpose of
section 5 was to encourage the election of no more than one
Senator from a county in such district, but as we have said
the voters remain free to defeat this aim. The statute thus
seeks to give recognition to the interest of a county as such
without regard to its population, without however compelling
the allocation of a Senator to an under-populated county.

It seems to us that *Fortson* is not controlling and cannot
be read to mean that a method which would allocate equal
membership to all counties is valid merely because the legisla-
tors are elected on a state-wide or regional basis. Indeed we
doubt very much that provisions such as those contained in
section 5 could be upheld as part of a permanent plan. None-
theless, we are constrained to conclude it is an admissible
approach for a temporary plan of reapportionment.

We must take into account the practical problems involved
in moving from a malapportioned Legislature to a constitu-

tional one. The pressing immediate need is to obtain a legislative body substantially close to the demands of *Reynolds v. Sims*. That much is achieved by *chapter* 19. That the solution may not be perfect or ideal should not obscure the giant step forward.

In our first opinion in this matter we said that we would call for argument upon the question whether the permanent plan may be devised only by a Constitutional Convention if a Constitutional Convention was not called by the Legislature before April 1. In our second opinion of March 31, 1965 we noted that there was pending legislation to provide for a Constitutional Convention and hence we would not then schedule argument upon that question. In view of the passage of time we hereby schedule argument upon that question for Thursday, June 3, 1965, unless prior thereto a statute shall be duly adopted providing for such a Convention. If a statute to that effect should be adopted any party contesting its validity may upon short notice to all parties of record bring such challenge before us by motion in this cause.

For the reasons we have given we find *chapter* 19 to be a valid exercise of the legislative power. No costs.

*For denial of motion for judgment*—Chief Justice WEIN-TRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*Opposed*—None.