(No. 41431.-

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, *vs.* RALPH E. FRANCIS *et al.,* Appellees.

*Opinion filed July 3, 1968.—Modified on denial of rehearing August 15, 1968.*

206

EDWARD P. DROLET, State's Attorney, of Kankakee, for appellant.

DONALD D. ZEGLIS, of Momence, for appellees.

Mr. JUSTICE HOUSE delivered the opinion of the court:

This is a *quo warranto* action by the State's Attorney of Kankakee County against the members of the Board of Junior College District No. 520 praying for their ouster on the ground that the Public Junior College Act (Ill. Rev. Stat. 1967, chap. 122, pars. 101—1 to 108—2), under which the District was organized and the Board elected, is unconstitutional. The circuit court of Kankakee County held the Act constitutional in all respects and dismissed the

complaint. Plaintiff elected to stand on the complaint and this appeal followed.

The parties use different sequences in discussing the 13 points of unconstitutionality alleged by plaintiff. We approach them somewhat arbitrarily, therefore, and will commence with plaintiff's basic thesis that the legislature lacked authority to create junior colleges, and the powers granted to the State Junior College Board were without sufficient standards and constituted discriminatory special legislation.

It is contended that section 1 of article VIII of the constitution, charging the legislature to provide a system of free schools, is a statement of limitation rather than grant. *People ex rel. Leighty* v. *Young,* 309 Ill. 27, is cited as precedent for the statement that no system other than a common-school system is within the power of the State to create. *People ex rel. Kane* v. *Weis,* 275 Ill. 581, held section 1 of article VIII to be a command to provide a system of free schools for all children of the State, and it is argued that even though the legislature had authority, the Act falls short of providing free schools because students may be required to pay tuition. (Junior college districts organized under the Public Junior College Act are not a part of the common school system.) The basic authority of the legislature is unrestricted save only if a power is denied by the State or Federal constitution. (*People ex rel. Moshier* v. *City of Springfield,* 370 Ill. 541.) The question of the legislature's power to create public corporations in the area of higher education was laid to rest in *People ex rel. Board of Trustees of U. of I.* v. *Barrett,* 382 Ill. 321, in connection with the University of Illinois. Since, as we have indicated, junior college districts are created under the legislature's power to create public corporations, *People* v. *Weis,* 275 Ill. 581, is inapplicable.

Section 2—12 of the Act (Ill. Rev. Stat. 1967, chap.

122, par. 102—12) is criticized as not giving sufficient standards to the State Board for organization of junior college districts, and section 5—4 (Ill. Rev. Stat. 1967, chap. 122, par. 105—4) is said to give the State Board absolute power to determine the manner of allocation of State funds between junior colleges without proper standards. These sections are charged to be invalid grants of legislative power, discriminatory special legislation and in violation of due process and equal protection.

Section 2—12(f) authorizes the State Board to determine standards and site location in relation to existing institutions of higher learning, possible enrollment, assessed valuation and business and agricultural conditions reflecting educational needs in the area. This is followed in section 3—3 by provision for notice and hearing on the question of organization. Evidence is to be heard as to the school needs and conditions of the territory and adjacent area. Only then may the State Board determine "whether it is for the best interests of the schools of such area and the educational welfare of the students therein that such district be organized, and shall determine also whether the territory described in the petition is compact and contiguous for college purposes." Section 4B—4 of the School Code (Ill. Rev. Stat. 1951, chap. 122, par. 4B—4), which gave county boards of school trustees practically identical powers with respect to organization and boundary changes of elementary and high schools, withstood a similar constitutional attack of lack of sufficient standards in *School District No. 79* v. *School Trustees*, 4 Ill.2d 533. It was there said at pages 537, 538: "It is to be admitted that these standards are general rather than specific in nature. However, it would be both impossible and undesirable for the legislature to draft rigid nondiscretionary standards which would embrace each and every school district boundary change." A line of cases originating with *Kenyon* v. *Moore*, 287 Ill. 233, was distinguished because the statutes set no standards

to guide county superintendents. *People ex rel. Board of Education* v. *Read,* 344 Ill. 397, struck down a statute which provided that in the creation or alteration of districts each must contain a city of 3,000 population for the reason that it prevented an adjacent area with the same total population and needs from organizing and hence was discriminatory. However, population and assessed valuation have been recognized as factors in fixing standards. Section 3—1 of the Act fixes minimum population at either 30,000 persons or at least three counties and assessed valuation at not less than $75 million as minimum standards. In *People* v. *Deatherage,* 401 Ill. 25, this court upheld a statute requiring a minimum population of 2,000 and a minimum assessed valuation of $6 million.

Section 2—12(e) delegates power to the State Board to determine adequate standards for the physical plant and facilities in language strikingly similar to that given to the Superintendent of Public Instruction in section 2—3.12 of the School Code. (Ill. Rev. Stat. 1963, chap. 122, par. 2—3.12.) In *Board of Education* v. *Page,* 33 Ill.2d 372, while we held the specifications promulgated under the power invalid, the statute itself was found to be constitutional. (See also *Department of Public Works and Buildings* v. *Lanter,* 413 Ill. 581; *People* v. *Illinois Toll Highway Commission,* 3 Ill.2d 218.) Nor do we think the power given the State Board to marshal priorities under section 5—4 lacks standards. As was said in the *Toll Road* case: "When it is necessary, the legislature may commit to others the responsibility for the accomplishment of the details of its expressed purpose. The scope of permissible delegation must be measured in terms of the complexity and diversity of the conditions which will be encountered in the enforcement of the statute." (3 Ill.2d 218, 233.) This statement applies forcefully to the junior college problem.

As heretofore noted, section 3—3 of the Act provides for notice and hearing on a petition to organize a junior

college district. Section 3—4 establishes procedures for the hearing. The State Board's decision is reviewable under the Administrative Review Act, application for review being restricted to petitioners or residents who appeared at the hearing. It is contended that these sections are discriminatory special legislation in violation of due process under the Federal and State constitutions, because they do not affect each member of the territory sought to be included alike, by denying those who were absent from the hearing their day in court. Reliance is placed on *People ex rel. Bensenville Com. H.S. Dist.* v. *Rathje,* 333 Ill. 304, which held that due process extends to administrative as well as judicial proceedings. In *Bagdonas* v. *Liberty Land and Investment Co.,* 309 Ill. 103, the settled principle was stated in part: "In order to authorize a judicial review of such classifications it must clearly appear that there is no fair reason for the law that would not require with equal force its extension to others not included. The legislature may determine upon what differences a distinction may be made for the purpose of statutory classification, between provisions otherwise having resemblance, if such power is not arbitrarily exercised and the distinction has a reasonable basis." (Pages 109-110.) We are of the opinion that there is a reasonable basis for the restriction. Those persons who did not take sufficient interest to appear and be heard at the hearing are in a different category from those who did appear. This provision is not a violation of due process.

Plaintiff asserts that sections 2—12 and 5—1 of the Act, allocating State tax funds for local purposes when all of the territory in the State is not eligible, are special legislation and a denial of due process. Reliance is placed on *Board of Education* v. *Haworth,* 274 Ill. 538. There, the attack was made on the statutory scheme by which State tax funds were apportioned to the county superintendent of schools of each county in proportion to the number of persons in each county under 21 years of age. The county superin-

tendent of each county was then required to pay out of the money apportioned to him the tuition of students residing in non-high school districts who attended high schools in other districts to a maximum of $40 per pupil. The provision was held invalid because the whole State was being taxed to provide funds which were used discriminatorily to assist the taxpayers of non-high districts by easing their tax burden while no such assistance was given to the taxpayers residing in a high school district. That case is distinguishable.

Allocations under the Public Junior College Act are made on the principle of providing economic assistance to junior college districts but on a nondiscriminatory basis for student residents of the State regardless of whether the student is or is not a resident of the junior college district. The nonresident junior college student is provided the same educational facilities and the same State aid per semester hour as is paid for a resident student so that all residents of the State who attend a junior college district receive equal and identical benefit of the funds collected on a statewide basis. The residents of a junior college district are not taxed to contribute to the local and corporate purposes of another public corporation since no other public corporation has the duty of providing junior college facilities and opportunities.

No citation of authority is offered for the proposition that sections 6—5.1, 6—5.2 and 6—5.8 of the Act are invalid as denying due process and equal protection because the State Board's determinations regarding the annexation or detachment of territory are not subject to administrative review. A similar objection was raised in connection with a park district in *People ex rel. Honefenger* v. *Burris,* 408 Ill. 68, and it was there said at page 79: "The legislature has the power to deny the privilege of detachment of territory to this park district, and cannot be compelled to bestow it for the benefit of any group therein. What we have

held, in respect to the denial of the right of detachment to school districts, applied with equivalent force to park districts of the character of the one attacked here. See *People* v. *Deatherage,* 401 Ill. 25 : *People* v. *Camargo School Dist.,* 313 Ill. 321." This attack is not well taken.

Section 6—2 of the Act provides that prospective junior college students who do not live within a junior college district may notify their local district by July 1 that they intend to attend some junior college in the State and they are then entitled to have their tuition paid by their district. This provision is attacked as being in violation of section 10 of article IX of the Illinois constitution, in that a high school district which contains territory not in a junior college district is forced to pay a debt which it did not incur and is for the corporate purposes of another municipal corporation. Further, it is suggested that taxpayers of the high school district are required to pay taxes to support junior college districts in which they do not reside. While the legislature may not directly levy a local tax, it has the power to grant municipalities that right when, in its discretion, it is deemed proper to do so. (*People ex rel. Moshier* v. *City of Springfield,* 370 Ill. 541.) Education relates to the general welfare of the State and is not local in nature. The State may impose an educational duty on a municipal corporation even though its performance will create a debt to be paid by local taxation. (*People ex rel. Sanitary Dist.* v. *Schlaeger,* 391 Ill. 314; *cf. Ruth* v. *Aurora Sanitary District,* 17 Ill.2d 11.) Neither *Sleight* v. *People,* 74 Ill. 47, nor *Morgan* v. *Schusselle,* 228 Ill. 106, cited by plaintiff, are applicable. Each authorized creation of an obligation for purely local purposes. Actually, the provision for tuition is for the public purpose of increasing educational opportunities to those residing outside a junior college district rather than paying the cost of operation of the junior college district attended.

Section 6—2 is further attacked because it may result in double taxation of a taxpayer who resides in a junior college district and within a high school district which is not entirely included in a junior college district. It is argued, again without citation of authority, that this violates the requirement of uniformity of taxation. "The principle of uniformity is not violated by levying taxes by two overlapping municipalities on the same property, even though it be for a similar purpose." (*Board of Highway Comrs.* v. *City of Bloomington,* 253 Ill. 164, 168; see also *People ex rel. Darnell* v. *Woodward,* 285 Ill. 165; *Dugan* v. *Berning,* 11 Ill.2d 353.) We find no constitutional infirmity in this connection.

Plaintiff argues that four different portions of the Act, other than those previously asserted, constitute arbitrary and discriminatory special legislation and that they deny equal protection of the law. They are said to involve substantially similar questions and issues and are argued by plaintiff as a unit.

Some background may be helpful to an understanding of these issues. The Public Junior College Act was adopted in 1965. All districts were originally classified as Class II. Provision was made for upgrading districts to Class I under section 4—10 after they met minimum requirements, including a finding by the State Board that the district meets the standards fixed by the statute and after approval by the Board of Higher Education.

Section 2—17 is criticized because it provides for apportionment of $9.50 for each semester hour in a course carried by an Illinois student to mid-term in a Class II district while section 2—16 provides for payment of $11.50 in a Class I district. There is a rational difference in these classifications for payment. A Class I district must provide a comprehensive junior college program, with emphasis upon vocational education, while no such requirement is

made as to Class II districts. Obviously, it costs more to operate a school with a comprehensive curriculum than one offering the minimum to qualify as a Class II district.

Sections 5—1 to 5—10 inclusive, which provide for State funds for junior college building purposes to Class I districts, but not to Class II districts, are similarly criticized. Again, there are adequate grounds for the classification. The legislature could reasonably determine that it was not to the best interests of the general public in the area of education to foster and perpetuate Class II districts by providing State funds for building programs. Since the public welfare requires a sound system for higher education, a differential can be made to encourage the upgrading of a district to Class I status. It has been long recognized that State funds need not be distributed equally. In *Martens* v. *Brady*, 264 Ill. 178, it was held that differential in aid for highways connecting principal cities and trading points in each county with each other was not an invalid classification.

Section 5—3 provides that no petition for funds for building purposes will be accepted unless the district contains three counties or that portion of three counties not included in a junior college district, or the projected enrollment shows 1,000 full-time students within five years in districts outside the Chicago metropolitan area and 2,000 full-time students in the Chicago metropolitan area. Plaintiff argues that this will result in a distribution of a disproportionate share of such funds among Class I districts. It is said that there is no rational basis for so classifying eligibility since it in no way reflects the relative necessity of building needs. The Master Plan for Higher Education in Illinois, July, 1964, emphasizes the need for development of facilities to serve commuter students. The legislature recognized the differences between the Chicago metropolitan area and the balance of the State. A single standard would

make it impractical for downstate areas to conduct a commuter program except on a submarginal basis. Of course, if downstate urban areas project 1,000 full-time students, the three-county provision is not in force. On the other hand, in those more sparsely inhabited areas which cannot provide 1,000 students, the three-county or parts-of-three-counties provision prevails. The number of students and areas which are within commuting distance is a matter for legislative policy and the courts should not interfere save only if there is no reasonable basis for the standards fixed.

Section 3—17 requires a preference to be given students residing in the district if space is not available to all student applicants. This does not affect the validity of the organization of the district or the selection of the Board and comes into effect only after the organization. In any event this has always been recognized as proper and does not constitute discrimination.

Two points raised by plaintiff involve the one man, one vote principle of *Reynolds* v. *Sims*, 377 U.S. 533, 12 L. Ed. 2d 506, 84 S. Ct. 1362, as applied in *Avery* v. *Midland County, Texas*, 390 U.S. 474, 20 L. Ed. 2d 45, 88 S. Ct. 1114, to a local governmental unit having general governmental powers over the entire geographic area served by the unit. Section 3— 6 of the Act provides that a Class I junior college district shall be governed by a seven-member board elected in the manner provided in article 9 of the School Code and also provides, "If more than 15% but less than 30% of the taxable property in any Class I junior college district is located in unincorporated territory, at least one member of the Board shall be a resident of such unincorporated territory; if 30% or more of the taxable property in such school district is located in unincorporated territory, at least two members of the Board shall be residents of such unincorporated territory." Plaintiffs argue that the quoted portion of section 3—6 requires the election

of members of the Board on other than a one man, one vote population basis and is a denial of equal protection of the law.

In *Avery* the governing body of Midland County, Texas, was the Commissioners Court consisting of five commissioners. One, the county judge, was elected at large from the county, and only voted to break a tie. The other four were chosen from districts whose population, according to 1963 estimates, was respectively 67,906, 852, 414, and 828. The city of Midland, which is the county's only urban center and has 95% of the county's population, was in a single district. In holding that the Midland County procedure for choosing members of the Commissioners Court was a denial of equal protection of the law, the court stated, "* * * the Constitution permits no substantial variation from equal population in drawing districts for units of local government having general governmental powers over the entire geographic area served by the body." (390 U.S. 474, 20 L. Ed. 2d 45, 53, 88 S. Ct. 1114, 1120.) The court rejected the contentions that this was a local government rather than a State government, that the State government which delegated the law-making power to the local government may itself be properly apportioned, that the County Commissioners did not have legislative functions, and that the work done by the Commissioners "disproportionately concerns the rural areas." The court did observe, however, that the one man, one vote principle "* * * does not require that a uniform straitjacket bind citizens in devising mechanisms of local government suitable for local needs and efficient in solving local problems," (390 U.S. 474, 20 L. Ed. 2d 45, 53, 88 S. Ct. 1114, 1120,) and cited in support of this observation *Dusch* v. *Davis*, 387 U.S. 112, 18 L. Ed. 2d 656, 87 S. Ct. 1554.

*Dusch* involved the apportionment of councilmen of the city of Virginia Beach, Virginia. In 1963 the city had

consolidated with adjoining Princess Anne County and a borough form of government was adopted. The new city consists of seven boroughs whose 1960 population was as follows: Blackwater 733; Pungo 2,504; Princess Anne 7,211; Kempsville 13,900; Lynnhaven 23,731; Bayside 29,048; and Virginia Beach 8,091. Bayside, Kempsville, and Lynnhaven are primarily urban; Blackwater, Princess Anne and Pungo are primarily rural; and Virginia Beach is primarily tourist. The city council is composed of 11 members, 4 of whom are elected at large without regard to residence and 7 of whom are also elected at large but each one of these 7 must reside in a different borough. The Court of Appeals held the Seven-Four Plan violated the one man, one vote principle of *Reynolds*. On appeal the Supreme Court stated, "The Seven-Four Plan makes no distinction on the basis of race, creed, or economic status or location. Each of the 11 councilmen is elected by a vote of all the electors in the city. The fact that each of the seven councilmen must be a resident of the borough from which he is elected, is not fatal." (387 U.S. 112, 115, 18 L. Ed. 2d 656, 659, 87 S. Ct. 1554, 1555.) The Supreme Court further stated, "* * * the present consolidation plan uses boroughs in the city 'merely as the basis of residence for candidates, not for voting or representation.' He is nonetheless the city's, not the borough's councilman. * * * If a borough's resident on the council represented in fact only the borough, residence being only a front, different conclusions might follow. But on the assumption that *Reynolds* v. *Sims* controls, the constitutional test under the Equal Protection Clause is whether there is an 'invidious' discrimination. * * * The Seven-Four Plan seems to reflect a detente between urban and rural communities that may be important in resolving the complex problems of the modern megalopolis in relation to the city, the suburbia, and the rural countryside. Finding no invidious discrimination

we conclude that the judgment of the Court of Appeals must be and is reversed." 387 U.S. 112, 116-7, 18 L. Ed. 2d 656, 659-60, 87 S. Ct. 1554, 1556.

All board members elected pursuant to section 3—6 are elected at large from the entire district. It is only when more than 15% but less than 30% of the taxable property is located in unincorporated territory that one member must reside in the unincorporated territory and when 30% or more of the taxable property is located in unincorporated territory that at least two members must reside in the unincorporated territory. As was the situation in *Dusch,* however, when the condition for residence of 1 or 2 members in the unincorporated territory exists, the rural member or members are, nevertheless, the district's representatives and not the unincorporated territory's representatives. Section 3—6 uses unincorporated territory "merely as the basis of residence for candidates, not for voting or representation." We find no invidious discrimination in section 3—6 and the requirement of 1 or 2 members residing in the unincorporated territory under certain conditions "seems to reflect a detente between urban and rural communities that may be important in resolving complex problems" in the administration of a junior college district. We hold that section 3—6 does not violate the equal-protection clause of the Federal constitution. (*Dusch* v. *Davis,* 387 U.S. 112, 18 L. Ed. 2d 656, 87 S. Ct. 1554; see also *Fortson* v. *Dorsey,* 379 U.S. 433, 13 L. Ed. 2d 401, 85 S. Ct. 498,) or section 18 of article II of our constitution which guarantees free and equal elections.

Plaintiffs also argue that section 3—5 of the Act requires the organizational election for a junior college to be conducted on other than a one man, one vote basis, and it therefore constitutes a denial of equal protection of the law under the Federal constitution and a denial of a free and equal election guaranteed by section 18 of article II of our constitution. *Amici curiae,* in addition to these constitu-

tional arguments, further argue that section 3—5 of the Act constitutes special legislation in violation of section 22 of article IV of our constitution.

Section 3—5 requires a separate majority of the votes cast on the proposition of organization within all of the incorporated areas of the proposed district and a separate majority of the votes cast in the unincorporated territory if more than 25% of the equalized assessed valuation of the proposed district is in unincorporated area. The record shows that more than 25% of the equalized assessed valuation of the district here in question was in the unincorporated area and the proposition for organization received a favorable majority in the incorporated area and in the unincorporated area.

The requirement that the proposition to create a district must receive a favorable majority in the incorporated and unincorporated area is a legislative scheme found in several other acts. (See *e.g.,* Ill. Rev. Stat. 1967, chap. 127½, par. 21 (fire protection districts); chap. 122, par. 11—4 (community consolidated school districts); chap. 122, par. 11—7 (community unit school districts); chap. 81, par. 1002—6 (public library districts); chap. 105, par. 2—7 (park districts, where election fails and subsequent election is called within 2 years).) Several of these acts have been before this court and the same State constitutional challenges now raised were there presented. These cases arose prior to *Reynolds* v. *Sims,* 377 U.S. 533, 12 L. Ed. 2d 506, 84 S. Ct. 1362, and the Federal constitutional issue was not raised.

*People* v. *Deatherage,* 401 Ill. 25 and *Grennan* v. *Sheldon,* 401 Ill. 351 were both decided at the September, 1948, term. *Deatherage* involved a *quo warranto* action testing the constitutionality of the statute authorizing organization of community unit school districts. Section 8—12 of the School Code (now section 11—7) contained the requirement for separate favorable majorities in the in-

corporated and unincorporated areas. This court held that section 8—12 did not violate section 18 of article II of our constitution requiring free and equal elections.

*Grennan* involved the review of an order for the holding of an election under an act to create a hospital authority. Under that act 1,000 voters or not less than 10% of the voters residing in the unincorporated territory could petition the county judge calling the election to separately canvass the election returns from the unincorporated and incorporated areas. The act further provided that if separate canvasses were made, a favorable majority in both the incorporated and unincorporated areas was required to create the hospital authority. The court held that "the provision enabling one class of voters to petition for separate canvass of votes and thus defeat the establishment of the [hospital] authority unless a majority of both classes are in favor thereof" amounts to an arbitrary classification by the legislature in contravention of section 22 of article IV prohibiting special legislation. (401 Ill. 351, 358.) The court further found that the legislature would not have passed the act without these provisions for separate canvass and separate favorable majority and accordingly declared the entire act void.

At the following term of court, *People* v. *Spaid,* 401 Ill. 534, and *People ex rel. Funk* v. *Hagist,* 401 Ill. 536, were decided. *Spaid* was a *quo warranto* action testing a hospital authority created under the act declared unconstitutional in *Grennan.* On the basis of *Grennan* the court held the hospital authority "was unlawfully organized or created."

*Hagist* was a *quo warranto* action testing the constitutionality of the statute authorizing the organization of community consolidated school districts. Section 8—6 of the School Code (now section 11—4) contained the requirement for separate favorable majorities in the incorporated and unincorporated areas of the proposed district. It was

held that the section did not violate section 18 of article II of our constitution requiring free and equal elections nor did it violate section 22 of article IV of our constitution prohibiting special legislation.

*Amici curiae* argue that the *Grennan* case is controlling. Apparently the legislature, and those charged with conducting elections for creation of districts under statutes with a provision similar to the one here under attack, have considered *Deatherage* and *Hagist* controlling. The legislature did not change existing acts and later enacted the section in question, and we now have about 380 school districts (the Annual School Report, Form No. 100, for the school year 1966-67 lists 28 old-type unit districts, 8 community consolidated unit districts, 9 charter unit districts and 339 community consolidated districts), about 29 district libraries (October 1967 Statistical Issue of Illinois Libraries, p. 669), about 696 fire protection districts (records of Illinois Association of Fire Protection Districts list this many as of 1967), and about 30 junior college districts (Report of Selected Data and Characteristics, Illinois Public Junior Colleges 1967-1968) created under such statutes.

*Grennan* can be distinguished from *Deatherage* and *Hagist* on the narrow ground that in *Grennan* the unincorporated territory had the right to petition for a separate canvass requiring a separate majority in the incorporated and unincorporated territory—a right not granted to the incorporated area. (*Cf. Kloss* v. *Suburban Cook County Tuberculosis Sanitarium Dist.,* 404 Ill. 87.) There is broad language in *Grennan,* however, which might indicate and which *amici curiae* believe indicates, that simply requiring separate favorable majorities in incorporated and unincorporated areas is unconstitutional. We feel the issue should be re-examined particularly in view of the recent one man, one vote decisions of the Supreme Court.

The parties have cited no cases involving the equal-protection clause of the Federal constitution with respect to

elections for the creation of a local governmental unit. As stated by the Supreme Court, "Our cases have, in the main, dealt with elections for United States Senator or Congressman [citations] or for state officers [citation] or for state legislators. [Citations.]" (*Sailors* v. *Board of Education of County of Kent*, 387 U.S. 105, 108, 87 S. Ct. 1549, 1552, 18 L. Ed. 2d 650, 653.) *Avery* v. *Midland County, Texas,* (20 L. Ed. 2d 45) dealt with the election of county officials. Assuming arguendo, as the Supreme Court did in *Sailors* "that where a State provides for an election of a local official *or agency,* the requirements of *Gray* v. *Sanders* and *Reynolds* v. *Sims* must be met," (387 U.S. 105, 109, 87 S. Ct. 1549, 1552, 18 L. Ed. 2d 650, 654, emphasis added) we believe that the section 3—5 of the Act does not constitute an invidious discrimination violative of the equal-protection clause.

The obvious purpose of the legislation is to give the rural area and the urban area an equal voice in the creation of a local governmental unit which will exercise authority equally over both areas. The Supreme Court in *Dusch* v. *Davis,* 387 U.S. 112, 18 L. Ed. 2d 656, 87 S. Ct. 1554, gave approval to a State legislative plan which, without invidious discrimination, recognized the difference between the urban communities and rural communities. The court in the second paragraph of the opinion described the boroughs involved as being primarily urban, rural or tourist. The court later observed: "The Seven-Four plan seems to reflect a detente between urban and rural communities that may be important in resolving the complex problems of the modern megalopolis in relation to the city, the suburbia, and the rural countryside." (387 U.S. 112, 117, 18 L. Ed. 2d 656, 660, 87 S. Ct. 1554, 1557.) Also involved in *Dusch,* although not passed upon, was the creation of a new local governmental unit to exercise authority equally over the residents of the former city and the county of Princess Anne. Under Virginia law this required a separate majority in the county

and in the former city. Virginia Code 1950, Tit. 15, art. 4 C.9.

We find no invidious discrimination in the legislative scheme giving the rural area and the urban area an equal voice in the creation of a local governmental unit which will thereafter exercise authority equally over both areas without regard to their rural or urban nature. Anything in *Grennan* v. *Sheldon,* 401 Ill. 351, and *People* v. *Spaid,* 401 Ill. 534, to the contrary notwithstanding, we hold that section 3—5 does not violate the equal-protection clause of the Federal constitution, section 18 of article II of our constitution or section 22 of article IV of our constitution.

The unannounced fear of requiring separate urban and rural majorities in order to create a governmental unit with authority over both areas seems to be that the rural area will defeat the proposition. This fear would appear to be unfounded because in a great number of the some 1,000 districts created under statutes where this requirement must have been operative, the rural area had to have consented for the districts to have been created.

We also note that while plaintiffs and *amici curiae* urge us to declare the junior college district here in question unlawfully organized because the organizational election was not conducted at large throughout the district, the effect of the election was as if it had been conducted at large. The statutory requirement for separate rural and urban majorities had no effect in this case because favorable majorities were given in the rural and urban areas.

For the foregoing reasons the judgment of the circuit court of Kankakee County is affirmed.

*Judgment affirmed.*