**William OWENS et al., Plaintiffs,**

v.

**SCHOOL COMMITTEE OF BOSTON et al., Defendants.**

**Civ. A. No. 69–934–F.**

United States District Court
D. Massachusetts.

Oct. 21, 1969.

MEMORANDUM OF DECISION
ON MOTION FOR PRELIM-
INARY INJUNCTION

FRANCIS J. W. FORD, District Judge.

Plaintiffs in this action, who include black voters, black pupils in Boston public schools and their parents and former black candidates for the Boston School Committee, allege in their complaint that the present method of electing the Boston School Committee deprives them of their rights under the Fourteenth and Fifteenth Amendments to the Constitution of the United States.

Plaintiffs at this time move for a preliminary injunction enjoining for the defendants from conducting an election for members of the School Committee scheduled to be held on November 4, 1969. Briefs have been submitted and arguments heard on the question of issuance of the injunction. Both parties are in apparent agreement that before a preliminary injunction can issue, plaintiffs must show a reasonable probability of ultimate success on the merits, and must also make a showing of irreparable harm to plaintiffs, resulting from the holding of the election, sufficient in the light of the injury to defendants if re-

lief is granted, to justify the exercise of the equitable powers of this court.

Under the provisions of § 18 of the Boston City Charter the School Committee is composed of five members elected at large for a term of two years. A preliminary election is held at which ten candidates are chosen to appear on the ballot at the final election at which five are chosen who will constitute the School Committee for the succeeding two years from the January following the election. Each voter is entitled to vote for five candidates both in the preliminary and final elections. The preliminary election was held on September 23, 1969 and the final election is to be held on November 4, 1969.

The at-large system of electing the School Committee has been used in Boston continuously since 1875 and the number of members has been fixed at five since 1905.

Plaintiffs purport to sue on behalf of themselves and of all black citizens of Boston, who are alleged to constitute at the present time about 13% of the total population of the city, most of whom are concentrated in one geographic area of the city. Plaintiffs' contention is that they constitute a definite racial minority group within the city who in an at-large election cannot elect by their own votes alone a member of their race or a candidate of any race favorable to their interests, while in an election by districts they might in one or more districts have enough votes to elect a candidate to represent them who would be favorable to their interests.

It should be noted that there is no claim here that any eligible citizen in Boston is being denied the right to cast his vote in any election. Nor is there any claim that the "one man, one vote" principle, as such, is being violated. Clearly in the present system each vote has exactly the same weight as any other. Nor does the mere fact that no candidate for whom an elector casts his ballot is successful in the election mean that the elector has been unconstitu-

tionally deprived of an effective right to vote. Such a result is merely the almost inevitable result in a democratic election in which the choice of the majority prevails over that of the minority.

The system of electing members of a governmental board in an at-large election is, of course, a device quite commonly used. There are advantages and disadvantages to the use of either the at-large or the district system of election. One supposedly ensures the election of the type of official who can command a wide support throughout the whole community and will be representative of and responsive to the needs of the community as a whole. The other is designed to ensure representation of the particular interests of the separate geographical segments of the community, perhaps at the expense of the general interest. It is true that the same persons who would be elected under one system would not necessarily be able to win election under the other system. There are many justifiable considerations which may lead a city to adopt one method of election rather than the other.

The essential question here is whether a city which has for a long time and for sound reasons used the at-large system is under a constitutional compulsion to adopt a district system in order to better the chances of a minority group to secure representation of their own particular interests. There is no case that clearly holds that there is such a requirement in the situation presented here. It has been clearly held that the at-large system is not per se unconstitutional. Dusch v. Davis, 387 U.S. 112, 87 S.Ct. 1554, 18 L.Ed.2d 656. Fortson v. Dorsey, 379 U.S. 433, 85 S.Ct. 498, 13 L.Ed.2d 401. It is true that dicta in those cases indicate that in some circumstances an at-large system might be invalid. Clearly this might be so if it were deliberately adopted for the purpose of minimizing the voting influence of some group within the electorate. But plaintiffs do not argue, and hardly could argue that a system adopted in 1875 was intentionally aimed at them.

And it is rather fanciful to contend that because the change to an at-large system in 1875 was, conjecturally, aimed at some other then minority group, the system should be banned as having been infected ab initio with an unconstitutional taint.

The situation most closely resembling that in the present case is the one involved in the recent case of Chavis v. Whitcomb, 305 F.Supp. 1364 decided July 28, 1969 by a three-judge court in the Southern District of Indiana. It was there held that the apportionment plan for the state legislature which established Marion County as a multimember district electing fifteen representatives was unconstitutional because it diluted the voting power of the black residents of one area within the county with a sufficient voting strength to elect at least one member from an appropriately constituted district. There is a significant difference in the cases. Indiana had made the choice of using the district system for electing its legislators. The basic question was not whether a multi-member district as such was wrong but where there was discrimination in a system which provided voters in some areas with the opportunity to elect a single representative for their district, while merging the plaintiffs' area, which could appropriately form a single district, into a fifteen-member district. In the present case there is no division of the city into districts and hence no discriminatory division which was a central factor in Chavis. Indeed, the court in Chavis clearly stated that multi-member districts as such were not wrong, and indeed expressly proposed as a possible constitutionally permissible plan, one which would divide the state uniformly into such districts, each electing three or four members.

Plaintiffs are rather vague in their definition of when, in their view, a minority group would be constitutionally entitled to have a district rather than an at-large system put into effect. They apparently concede that not every minority group is entitled to a district in which it might control an election, and that the group should be at least of some minimum size—a size which they only define as "cognizable". Moreover the district system would be helpful to a minority only when it is geographically concentrated and would do no good to a minority uniformly spread throughout the whole area. Indeed, even when a minority group is of a certain minimal size and geographically concentrated, a district system is not necessarily to its best advantage. A minority constituting 13% of the electorate in some circumstances might do better if located in a district where it would effectively control the election of one of the five members to be elected. But in other circumstances such a group of voters might in fact hold a balance of power position where it could effectively influence the election of all five members. It simply cannot be held a priori that a district system is constitutionally required to protect the effective voting rights of a minority group.

Of course, in a particular case, it may be possible to prove as a matter of fact that a district system is the only way to protect a group's voting effectiveness. At this state of the present case it is not clear that that fact can be shown here. Plaintiffs argue that in recent School Committee elections in Boston no black candidate has been elected, and that certain white candidates whom plaintiffs classify as responsive to their interests have also been defeated. But it is also to be noted that one of these white candidates specifically named by plaintiffs is this year one of the ten named in the preliminary election from whom the final selection will be made on November 4.

The nine-member Boston City Council is also chosen at the same time as the School Committee and by the same at-large system of election. In the 1967 election one black candidate was elected at-large to the City Council and this year as a candidate for reelection is one of the eighteen from whom the final choice is to be made in November.

■ The Boston School Committee, defendants contend, is essentially an administrative body charged with the conduct and operation of one department of the city, and having no general legislative power and no power to tax. Its functions could readily be assigned to an appointed official or board, to the appointment of which the restrictions of Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 and the subsequent apportionment cases do not apply. Sailors v. Board of Education of Kent County, 387 U.S. 105, 87 S.Ct. 1549, 18 L.Ed. 2d 650. The School Committee here does not strictly fall within the ruling in Avery v. Midland County, 390 U.S. 474, 88 S.Ct. 1114, 20 L.Ed.2d 45. Of course, the ultimate answer may be that while the city does not have to have an elected school committee, if it choses to have one, the election procedures must meet the same requirements as those for election of local legislative bodies with general powers.

■ Without in any way anticipating what its final decision after a full trial on the merits may be, the court must find that at the present stage of the case, plaintiffs have not shown a sufficiently reasonable possibility of finally prevailing on the merits to justify the issuance of a preliminary injunction.

■ There is one other aspect of this case which dictates that a preliminary injunction should not issue at this time. Plaintiffs, of course, contend that the continued denial of their claim to a constitutional right to representation on the School Committee constitutes an irreparable injury. Even assuming this to be true, the issuance of an injunction is not justified unless it is shown that the injury to plaintiffs outweighs the harm which issuance of the injunction would cause to defendants, and that in fact the issuance of the injunction will at least mitigate plaintiffs' claimed injury.

■ The issuance of an injunction against the November 4 election would clearly cause harm to the City of Boston, placing it in a position where it would be without any properly constituted authority to operate its schools, and would be compelled to provide an interim emergency authority to carry on one of its vital functions. The interruption of the orderly processes of municipal elections is an extraordinary exercise of the power of this court. Courts have refrained from enjoining pending elections even after finally deciding that the plan of representation violated the constitution, in order to allow local authorities more opportunity to bring their procedure into compliance with the constitutional mandate. Delozier v. Tyrone Area School Board, D.C., 247 F.Supp. 30, 36. Much less should the court exercise that power before final decision has been made.

On the other hand, the granting of this preliminary injunction would give plaintiffs nothing in the way of relief from the injuries of which they complain. Stopping this election, as such, will do nothing for plaintiffs, apart from the psychological satisfaction of winning an opening skirmish. Nothing can be done to give the plaintiffs the kind of School Committee they desire until there is a final decision by the courts that the present system of election is constitutionally invalid. Even then, comity would lead this court to allow the state and city authorities a reasonable time in which to adopt a constitutionally acceptable alternative, whether it be a School Committee elected by districts, the substitution of an appointed authority, or otherwise.

■ The usual function of a preliminary injunction is to preserve the status quo pending a determination of the action on the merits. Tanner Motor Livery, Ltd. v. Avis, Inc., 9 Cir., 316 F. 2d 804. What plaintiffs seek here is a preliminary injunction whose effect would be to upset the status quo, to the substantial detriment of defendants and without substantial benefit to plaintiffs.

Plaintiffs' motion for a preliminary injunction is denied.