John E. BAKER et al.

v.

**REGIONAL HIGH SCHOOL DISTRICT NO. 5 et al.**

No. N–74–75.

United States District Court,
D. Connecticut.

May 20, 1977.

Ralph G. Elliot, Alcorn, Bakewell & Smith, Hartford, Conn., Ralph K. Winter, Jr., James O'Connor Shea, New Haven, Conn., for plaintiffs.

Gerald P. Dwyer, William J. Cousins, Charles L. Flynn, S. Robert Jelley, New Haven, Conn., for defendants.

MEMORANDUM OF DECISION

NEWMAN, District Judge.

This case concerns the constitutionality of an apportionment plan for the Board of

Education of Regional High School District No. 5. The pending question can be understood best when viewed against the background of this protracted dispute.

Plaintiffs are residents, taxpayers, and electors of the town of Orange. They filed this lawsuit over three years ago against defendant Regional High School District No. 5, its Board of Education, the Board members, the District superintendent, and the treasurers and clerks of the towns of Orange, Woodbridge, and Bethany. District No. 5 was formed in 1952–53 by the voters of the towns of Orange, Bethany, and Woodbridge for the purpose of providing facilities for and administering the education of students in grades 7 to 12 of the public schools. Intervenors are voters, residents and selectmen of the towns of Woodbridge and Bethany.

When District No. 5 was established, a Regional Board of Education was organized as an elective body having nine members. Three members of the Board were to be elected by the voters of each of the three towns in the District. In other words, each of the three towns was an election district from which three Board members were elected.

More than two years ago, this Court ruled that this allocation of membership on the District Board of Education was unconstitutional because it substantially diluted the votes of Orange electors.[1] *Baker, et al. v. Regional High School District No. 5, et al.,* Civil No. N–74–75 (D.Conn.1974), *aff'd,* 520 F.2d 799 (2d Cir. 1975), *cert. denied sub nom. Nonnewaug Regional School District No. 14, et al. v. Scott,* 424 U.S. 965, 96 S.Ct. 1458, 47 L.Ed.2d 731 (1976). When that ruling was filed, the Court deferred consideration of prospective relief to afford the

Connecticut General Assembly an opportunity to devise a legislative solution to the problems encountered in correcting the malapportionment of regional school boards.

The legislature responded by enacting Public Act 75–644. This statute, approved on July 9, 1975, provides an elaborate procedure for reconstituting regional school boards to conform to federal constitutional requirements. One aspect of this procedure is the formation within each regional school district of a District Reapportionment Committee (DRC). A DRC was duly appointed in District No. 5, and after extensive deliberations, the Committee approved, by a majority vote, a reapportionment plan for the District. Pursuant to Public Act 75–644, the DRC transmitted the plan to the State Board of Education. On December 7, 1976, the State Board of Education voted to reject the plan because "it failed to meet federal constitutional standards." The Board advised that the plan should be modified to avoid dilution of the voting strength of the voters of the town of Orange.

On January 5, 1977, the intervenors in this case, the Woodbridge and Bethany members of the DRC, appealed the Board of Education determination by filing an action in the Court of Common Pleas. On February 2, 1977, Judge Dorsey of the Court of Common Pleas stayed further proceedings with respect to the reapportionment of District No. 5 until determination of the action in the state court, or until further order of this Court.

On January 27, 1977, plaintiffs moved in this Court for an order requiring the District Board of Education to adopt weighted voting until such time as the Court would be able to determine whether the District has been properly reapportioned.[2]

1. When the Court of Appeals decided the appeal from the decision of the Court granting plaintiffs' motion for summary judgment, the following facts had been submitted. The population of Bethany was 3,857, of Orange, 13,524, of Woodbridge, 7,673. In 1972–73 Orange contributed 55.04% of the total school budget; Bethany contributed 15.62%; and Woodbridge contributed 29.34%. Although the precise figures have certainly changed in the last few years, the parties do not dispute that the rela-

tionship between the towns in population and contributions to the school budget has remained substantially the same.

2. Plaintiffs' proposal called for a system whereby the vote of the three Board of Education members from Orange would be weighted at 55% (with each of the three members having a vote weighted at 18.33%); the vote of the three members from Woodbridge would be weighted

Intervenors moved to intervene in opposition to plaintiffs' request. A hearing was held at which time all counsel agreed to submit to the Court the question of the constitutionality of the apportionment plan adopted by the DRC, but rejected by the State Board of Education. In addition, counsel have submitted briefs on the constitutionality of an apportionment plan based on weighted voting.

A preliminary question is whether the motion to intervene should be granted. Intervenors claim that their interests as voters, residents, and parents of school children are affected by the proceedings in this action. Specifically, they allege that a ruling by the Court granting the relief sought by plaintiffs' motion, imposition of weighted voting, would violate their Fourteenth Amendment rights to equal protection. Moreover, intervenors contend that no existing party to this action adequately represents their interests.

█ It seems clear that intervenors meet the requirements of Fed.R.Civ.P. 24(a)(2). Their interests are directly affected by any apportionment plan that is approved. Assuming, *arguendo,* that weighted voting would deny intervenors' rights to equal protection, then the granting of plaintiffs' motion would impair the ability of intervenors to protect their interests. In fact, intervenors have taken up the laboring oar in opposing plaintiffs' motion. The principal defendants, District No. 5 and its Board of Education, have taken no position on the motion. The foregoing reasons indicate that the genuine controversy now before the Court is between plaintiff and intervenors. Accordingly, the motion to intervene is granted.

The next question is to determine what issues on the merits are appropriately before this Court and the order in which they should be considered. The motion that occasioned the parties' return to this Court is the plaintiffs' motion to impose weighted voting as interim relief pending a final de-

termination of prospective relief. Obviously the plaintiffs' motion was triggered by the State Board's rejection of the plan adopted by the DRC, and intervenors' appeal of the Board's decision filed in the Court of Common Pleas. Fearing that the procedure contemplated by the legislature would be stalled, plaintiffs returned to this Court to seek interim relief. In a technical sense, all that is pending before me is plaintiffs' motion for interim relief. However, as previously mentioned, on the hearing of this motion, all counsel agreed that this Court should decide the merits of the federal constitutional challenge to the DRC's plan.

█ Of course, there are limits on the extent to which parties can, even by agreement, legitimate a court's authority to adjudicate. Plainly the parties could not confer subject matter jurisdiction if it were lacking. But there is no doubt that this Court has subject matter jurisdiction over the essential dispute between the parties, *i. e.,* whether the original apportionment was consistent with the Fourteenth Amendment and if not, what prospective equitable relief the plaintiffs are entitled to in order to vindicate their constitutional rights. It is in the course of determining the appropriateness of prospective equitable relief that the Court is asked to adjudicate the constitutionality of the DRC's plan. In effect, the plaintiffs believe they are entitled to interim relief because in their view the DRC has failed to adopt a plan that meets constitutional standards, and the request for interim relief is opposed on the ground that the DRC plan is constitutional. Thus, in a very real sense, the entitlement of the plaintiffs to some form of interim relief depends on whether or not the DRC has adopted a plan that meets federal constitutional standards. Of course, this Court has no appellate jurisdiction to review the decision of the State Board of Education rejecting the DRC's plan. But since the validity of that plan under the Fourteenth Amend-

at 30% (with each of the three members having a vote weighted at 10%); and the vote of the three members from Bethany would be weight-

ed at 15% (with each of the three members having a vote weighted at 5%).

ment is an issue inextricably bound up in determination of plaintiffs' entitlement to interim relief, this Court, in the exercise of its original jurisdiction, can decide the issue of the plan's constitutionality. Moreover, the exercise of such jurisdiction is plainly appropriate in view of the state court's stay pending further order of this Court and the expressed preference of all counsel for decision here. Indeed, whether the DRC's plan meets federal constitutional standards should be decided first, because if it does, the availability of a plan formulated pursuant to state law and lawful as a matter of federal law would be a sufficient reason for this Court to decline to order some other plan as interim relief.

On October 7, 1976, the DRC voted to recommend the following plan ("the 3–3–3 plan") to the State Board of Education:

> The District No. 5 Regional School Board of Education shall be composed of nine (9) members elected at large. Of the nine (9) members, three (3) are to be residents of Bethany; three (3) are to be residents of Woodbridge; three (3) are to be residents of Orange. Each member is to have one vote.

Intervenors in this case, the Woodbridge and Bethany members of the Reapportionment Committee, voted for this plan; the Committee members from Orange voted against it.

Plaintiffs' claim is that the 3–3–3 plan is unconstitutional because it dilutes the voting power of voters in Orange. The basis for this claim is two-fold. First, plaintiffs point to the fact that 55% of the population in the District resides in Orange. Accordingly, plaintiffs contend that the one person-one vote doctrine requires a plan that entitles Orange voters to a majority of the representatives on the Regional Board of Education. Second, plaintiffs contend that the 3–3–3 plan permits representatives from the smaller towns of Bethany and Woodbridge to wield majority power on the Board. Intervenors dispute this interpretation of the plan, and claim that it is constitutional.

Nearly three years ago, this Court stated that Connecticut's efforts to establish regional school administration would require "creative legislative authorization and cooperative local arrangements [to] resolve the competing large and small town interests within Constitutional standards." *Baker, supra* at 8. The issue presently before the Court is whether the 3–3–3 plan, the product of local efforts to resolve this dispute, accords with constitutional standards. Several Supreme Court decisions, involving challenges to somewhat similar electoral plans, suggest the standards to be applied.

At the outset, it is clear that the 3–3–3 plan does not contain any malapportionment defects in the classic sense of the misallocation of political seats among electoral districts of substantially unequal population. See, e. g., *Baker, supra; Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). The 3–3–3 plan provides for the at-large election of all the members of the Board of Education by all the qualified electors in the District. Thus, as a matter of arithmetic, every vote cast by each voter in the District has equal weight in determining the election of each of the nine Board members.

Despite this at-large feature, and the apparent assurance of equal treatment it offers to voters in the District, plaintiffs contend that the 3–3–3 plan will in reality yield results no different from the apportionment scheme the Court found unconstitutional two years ago. Plaintiffs' claim is that the plan's residency requirement will lead to the election of Board members intent on representing the towns where they reside, rather than district-wide constituencies.

On three occasions the Supreme Court has ruled that the one person-vote requirement of the Fourteenth Amendment is not violated by an at-large election plan for a governmental unit that requires those elected to be residents of subdivisions within the unit. *Dallas County v. Reese,* 421 U.S. 477, 95 S.Ct. 1706, 44 L.Ed.2d 312 (1975); *Dusch v. Davis,* 387 U.S. 112, 87 S.Ct. 1554, 18 L.Ed.2d 656 (1967); *Fortson v. Dorsey,* 379 U.S. 433, 85 S.Ct. 498, 13

L.Ed.2d 401 (1965). The plain lesson of these cases is that an apportionment plan with residency requirements for officials elected at-large does not constitute a *per se* violation of one person-one vote requirements, although the actual operation of such a plan, as distinguished from its anticipated consequences, may provide the basis for constitutional challenge.

The progression from *Fortson* to *Dallas County* reveals the Supreme Court's views with increasing clarity. *Fortson* involved a state senate plan with some senators elected from single-member districts and others elected at large from multi-member county districts. The plan required those elected from the multi-member districts to be residents of different subdistricts within each county district. Though the essential complaint was that some voters had a chance to concentrate their voting power to elect one senator from their district, while others had to share their voting power with voters throughout a multi-member district in the election of several senators, the Court spoke broadly in favor of the subdistrict residency requirement:

> The statute uses districts in multi-district counties merely as the basis of residence for candidates, not for voting or representation. Each district's senator must be a resident of that district, but since his tenure depends upon the county-wide electorate he must be vigilant to serve the interests of all the people in the county, and not merely those of people in his home district; thus in fact he is the county's and not merely the district's senator.

*Fortson v. Dorsey, supra,* 379 U.S. at 438, 85 S.Ct. at 501.

*Dusch* made clear that validity of a residence requirement was not limited, as in *Fortson,* to districts subdivided within an existing unit of government, but extended as well to a single unit of government joined with other areas to form a larger governmental unit. *Dusch* involved a plan

for a municipal council to govern a new municipality formed out of the merger of a city and an adjacent county. The plan called for the election of eleven at-large members, seven of whom had to be residents of different boroughs within the new municipality. The former city became one of the new boroughs. Population of the boroughs ranged from 733 to 29,048. The Fourth Circuit held the plan unconstitutional because of the population disparity among the boroughs, each of which was assured at least one resident councilman. *Davis v. Dusch,* 361 F.2d 495 (4th Cir. 1966). The Supreme Court reversed, upholding the plan on the authority of *Fortson,* thereby indicating that residency requirements are valid even when established for subdistricts of substantially unequal population.

*Dallas County* involved a plan for a four-member county commission. All four were elected at large, but each had to be a resident of different residency districts within the county. One of the residency districts was a city containing nearly half the county's population. The Fifth Circuit invalidated the plan on the ground that the voting strength of the city's electors was diluted by the prospect that three-fourths of the county commissioners would come from districts containing one-half of the voters. *Reese v. Dallas County,* 505 F.2d 879 (5th Cir. 1974). The Fourth Circuit sought to distinguish *Dusch* on the ground that the four members elected without regard to borough residence gave assurance that voters in the larger boroughs would not inevitably be represented by a majority of members from the smaller boroughs. The Supreme Court reversed *per curiam,* rejecting the "theoretical presumption" that elected officials "will represent the districts in which they reside rather than the electorate which chooses them." *Dallas County v. Reese, supra,* 421 U.S. at 481, 95 S.Ct. at 1708.[3]

---

**3.** It was probably not realistic in *Dallas County,* nor would it be so in this case, to posit such a sharp distinction between an elected official's representation of his residency district "rather than" his representation of the larger

area in which the at-large election occurs. 421 U.S. at 481, 95 S.Ct. 1706. Representation implies a mix of relationships. Frequently the dominant relationship is with the total constituency in which the election occurs, but even

Two circumstances provide a slight factual distinction between the 3–3–3 plan at issue here and any of the plans upheld by the Supreme Court. First, all of the residency subdivisions (towns) within the regional school district continue to be governmental units for all traditional purposes of local government, whereas in *Dallas County*, it appears that only one of the subdivisions, the city of Selma, remained an entity of local government, with the boundaries of the other three subdivisions having no other significance except as residency districts for the election of county commissioners. But there is not the slightest hint in the Supreme Court's decision in *Dallas County* that the result would have been different if all four residency districts, rather than just Selma, had independent existence as units of local government.

Of arguably greater importance is the fact that this case involves multi-member residency districts, *i. e.,* three members must reside in each town, whereas *Fortson, Dusch,* and *Dallas County* all involved single-member residency districts. This feature of the 3–3–3 plan demonstrates that the plan seeks to achieve some purpose beyond simply assuring that the residences of board members are scattered throughout the district; a requirement that at least one member reside in each town would serve that limited purpose. But once the Supreme Court has upheld single-member residency districts of widely different populations, it is difficult to find in the Court's decisions any indication that invalidity occurs when a number larger than one is used to determine how many members must reside in each residency district. The rulings in *Dusch* and *Dallas County* would be satisfied by a plan calling for the at-large election of a regional board of three members, each one of whom was required to live in a different town. No distinction of constitutional significance appears between such a 1–1–1 plan and the proposed 3–3–3 plan.

Moreover, the Supreme Court decisions would clearly validate an at-large election plan for nine single-member residency districts with three located in each of the three towns. In reality, that is the approach taken in *Dallas County,* where the rural area of the county (which on a population basis would have been entitled to one representative for each representative allotted to Selma) was subdivided into three single-member residency districts. If each town in Regional District No. 5 could have been subdivided into three single-member residency districts, the use of each town as a residency district for three members poses no greater threat to Fourteenth Amendment rights. Indeed three three-member residency districts has the virtue of permitting all the voters of the school district a greater choice of candidates by enabling any three residents of a town to serve no matter where they live within the town.

What emerges from consideration of the Supreme Court decisions is that the Court is willing to give a presumptive validity to an at-large election plan notwithstanding subdistrict residency requirements. One may wonder whether the Court has adopted this approach based on the expressed confidence in an elected official's responsiveness to his district-wide constituency or on an unexpressed effort to temper the strictness of one person-one vote standards with a more flexible regard for local political accommodations—a modest withdrawal from the political thicket. In any event, we are instructed to uphold such plans against even the direst predictions that elected members will in fact represent the towns of their residence to the detriment of their district-wide constituency. It is sufficient that all the members of the regional school board will be nominated and elected on an at-large basis.[4]

when this is so, other relationships are maintained with more narrowly based groups, whether identifiable by the elected official's occupation, age, sex, national origin, race, or residence. President Carter does not cease to be a representative of all the people of the United States simply because to some lesser extent he is a representative of Georgia or of the entire South.

4. The plan contemplates nominations by caucuses of political parties open to all the enrolled voters of each party from throughout the

The Supreme Court has not gone so far, however, as to insulate such plans from constitutional attack if in practice the plans produce unconstitutional results. In *Dusch* the Court warned, "If a borough's resident on the council represented in fact only the borough, residence being only a front, different conclusions might follow." 387 U.S. at 116, 87 S.Ct. at 1556. In *Dallas County* the Court emphasized that such "different conclusions" could be based only upon the results of a plan, and not its expectations. "We think it clear, however, that *Dusch* contemplated that a successful attack raising such a constitutional question must be based on findings in a particular case that a plan in fact operates impermissibly to dilute the voting strength of an identifiable element of the voting population." 421 U.S. at 480, 95 S.Ct. at 1708.

The content of these cautions remains to be determined. Potentially they could lead the Supreme Court even deeper into the political thicket, if, for example, factual inquiry were to be undertaken in each case to determine whether a member's vote had been more significantly influenced by his loyalty to the town of his residence than by his perception of the legitimate needs of his district-wide constituency. Presumably, the factual showing the Court contemplates will eschew inquiry into motive in favor of consideration of the objective facts of the actions taken by the elected body. That appears to be what Judge Bell had in mind when he voted in the Court of Appeals to remand *Dallas County* for determination of whether the taxes levied, expenditures made, and services rendered demonstrated that invidious discrimination was occurring. 505 F.2d at 893. *Cf. Hawkins v. Town of Shaw, Mississippi,* 461 F.2d 1171 (5th Cir. 1972). Thus, the members of the regional school board to be elected under the 3–3–3 plan will be subject to two constraints: if their performance in office does not find favor with a majority of the district's electors, they will not be re-elected, and if their performance in office should demonstrate that the entire plan of apportionment, with its town residency requirements, operates as an invidious discrimination against an identifiable element of the voting population, the entire plan will face invalidation.

As yet, the 3–3–3 plan is untried and untested. The prospects for its development are unclear. Although plaintiffs seem resigned to the belief that the 3–3–3 plan will inevitably impair the interests of voters in the District's large town, who constitute a majority of the District's voters, the plan may have an unexpected salutary effect. Perhaps the plan will influence a new alignment of political forces in the District and encourage candidates for the Board of Education to fashion regional, rather than town, constituencies. If so, then the plan will not only have passed constitutional muster, it will have also contributed to the development of a healthy atmosphere for the resolution of regional public education issues in District No. 5.

Since this Court concludes that the 3–3–3 plan on its face is consistent with the one person-one vote standards of the Fourteenth Amendment, plaintiffs' motion to impose weighted voting as interim relief must be denied. The availability of a locally promulgated plan that satisfies federal constitutional standards makes it inappropriate to change the existing arrangement at this time. However, potential problems remain.

■ Plaintiffs have attacked the 3–3–3 plan not only on federal constitutional grounds but also on the grounds that it violates requirements of local town charters and state election laws. It would be entirely inappropriate for this Court to adjudicate those state law issues. The plaintiffs appear to have at least two alternative routes to adjudication of these issues. They could return to the State Board of Education and seek to have the 3–3–3 plan invalidated on state law grounds. Or, with the appeal still pending in the Court of Common Pleas from the decision of the State Board of

district. In addition candidates can be nominated by petitions signed by 5% of the electors

of the district; petition signers can be drawn from throughout the district.

Education that invalidated the plan on federal constitutional grounds, the plaintiffs could return to the Court of Common Pleas and seek to uphold the Board's decision on the grounds that the plan violates provisions of state and local law. In either event, it would seem that this Court's decision rejecting the federal constitutional challenge to the plan would have preclusive effect, the parties having explicitly consented to adjudication of that issue in this forum. Return to the Court of Common Pleas may well be the most expeditious way to resolve whatever issues remain in this controversy.

It is to be hoped that the parties will cooperate in determining a course for prompt adjudication of whatever issues remain. In any event, while plaintiffs' pending request for interim relief will be denied, this Court will continue to retain jurisdiction so that plaintiffs may reapply for interim relief in the event a locally promulgated plan, valid under state law, is not put into effect within a reasonably expeditious time. The rights of the plaintiffs, still impaired by the apportionment plan currently in effect, are yet to be vindicated. It should be clearly understood, however, that this Court's retention of jurisdiction is not an obstacle to adjudication of any attacks on the 3–3–3 plan on state or local law grounds in any appropriate state administrative or judicial forum.

Finally, so that the continuing nature of the controversy will not be a bar to federal appellate review, if sought by plaintiffs, plaintiffs' attack on the 3–3–3 plan will be considered a separate claim for relief within the meaning of Fed.R.Civ.P. 54(b), i.e., a claim for a declaratory judgment of invalidity on federal constitutional grounds, and there being no reason for delay, it is hereby ORDERED that judgment enter declaring that the apportionment plan adopted for Regional School District No. 5 by the District Reapportionment Committee is not inconsistent with the one person-one vote standards of the Fourteenth Amendment.