John E. BAKER et al.

v.

**REGIONAL HIGH SCHOOL
DISTRICT NO. 5, et al.**

Civ. No. N–74–75.

United States District Court,
D. Connecticut.

Sept. 12, 1979.

Ralph G. Elliot, Hartford, Conn., for plaintiffs.

Ralph K. Winter, Jr., James O'Connor Shea, New Haven, Conn., for intervenors.

## MEMORANDUM OF DECISION

NEWMAN, Circuit Judge.*

This is the third time that the constitutionality of an apportionment plan for the Board of Education of Regional High School District No. 5 has been before this Court. The issue now, as before, is whether the existing District No. 5 plan is consistent with the one person-one vote requirement of the Fourteenth Amendment.

District No. 5 consists of three towns, Bethany, Orange, and Woodbridge; its Board of Education is responsible for administering grades 7 to 12 of these towns' public schools. When District No. 5 was first established, the Board consisted of nine members, three of whom were elected from each of the three constituent towns. The towns, however, have substantially different populations, Orange being approximately twice as populous as Woodbridge

and four times as populous as Bethany. In response to a suit by residents and taxpayers of Orange, this Court declared that the allocation of membership on the Board violated the Equal Protection Clause of the Fourteenth Amendment because it diluted the votes of the Orange voters. *Baker v. Regional High School District No. 5*, Civil No. 74–75 (D.Conn.1974), *aff'd*, 520 F.2d 799 (2d Cir. 1975), *cert. denied sub nom. Nonnewaug Regional School District No. 14 v. Scott*, 424 U.S. 965, 96 S.Ct. 1458, 47 L.Ed.2d 731 (1976). Consideration of prospective relief was deferred to allow the Connecticut General Assembly an opportunity to authorize procedures for an appropriate solution.

The Assembly responded by enacting a statute, Public Act 75–644, which provided for the reconstitution of regional school districts through the instrumentality of a District Reapportionment Committee (DRC). In each case, the DRC was to develop a plan that would be submitted for approval to the State Board of Education, and then to the voters of the regional district's constituent towns. District No. 5 duly appointed a DRC; the plan that emerged provided that the nine Board members were to be elected at large, thus weighting the votes of all electors equally. However, the plan also contained a novel requirement that there must be three members of the Board residing in each of the three towns (the "3–3–3 Residency Plan"). The State Board of Education rejected this Plan, however, because it felt that the plan violated the Equal Protection Clause. Following a state court proceeding,[1] plaintiffs presented the issue of the 3–3–3 Residency Plan's constitutionality to this Court. The Woodbridge and Bethany members of the DRC intervened, pursuant to Fed.R.Civ.P. 24(a)(2), in favor

* Of the United States Court of Appeals for the Second Circuit, sitting by designation. At the time of the submission of intervenors' motion, Judge Newman was a District Judge of the United States District Court for the District of Connecticut.

1. The Woodbridge and Bethany DRC members, intervenors in the present case, appealed the State Board of Education decision to the Court

of Common Pleas, which stayed further proceedings with respect to the reapportionment. Plaintiffs then moved in this Court for an interim order requiring the adoption of weighted voting, which intervenors opposed. At the hearing of this motion, all counsel agreed that this Court should decide the merits of the constitutional question.

of the Plan. This Court held that the Plan satisfied constitutional requirements, but retained jurisdiction of the case. *Baker v. Regional School District No. 5*, 432 F.Supp. 535 (D.Conn.1977). The Plan was then approved by the State Board of Education. On January 17, 1978, it was submitted to a vote by the voters of the three constituent towns and was rejected.

The DRC then proceeded to develop a second new plan. This provided for a 13-member Board; seven members elected by voters from Orange, four by voters from Woodbridge, and two by voters from Bethany (the "7–4–2" Plan). Each member is to have one vote. The apportionment of the 13 seats is roughly consistent with the population of the three towns. However, the new Plan includes the following ingenious requirement: "the Board may not act on a majority composed solely of representatives from the Town of Orange or solely of representatives from the Towns of Bethany and Woodbridge." This Plan was approved by the State Board of Education and, on September 25, 1978, was also approved by the voters of each town. It is now in effect.

The intervenors now apply to this Court for a determination that the 7–4–2 Plan is constitutional. The plaintiffs concede that the Plan's distribution of Board members among the three towns meets the one person-one vote requirement of the Equal Protection Clause. They express serious doubts, however, about whether the provision forbidding actions by a majority composed solely of the members from the largest town, or from the two smaller towns, is constitutionally acceptable. But the plaintiffs do not seek invalidation of the Plan. Instead, they ask this Court not to decide the case, on the ground that jurisdiction is lacking, and that a decision at this time would be "jurisprudentially premature and unwarranted." Intervenors respond that the Plan is in effect, and that there is no reason to delay final disposition of the case. In addition, they point out that Public Act 77–352 permits towns to withdraw from regional school districts as a matter of right only until October, 1979, and that their informed consideration of this "concededly

extreme option, as well as others, would be greatly enhanced" by a final disposition.

■ To begin with, plaintiffs' doubts about the jurisdiction of this Court may be quickly resolved. The intervenors have in effect asked for a declaratory judgment that the 7–4–2 Plan presently in operation in District No. 5 meets constitutional standards. The test for determining whether an action for declaratory judgment satisfies the case or controversy requirement of Article III is whether there is a substantial controversy between parties having adverse legal interests that is of sufficient immediacy to warrant such a declaration of rights. *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941). See *Lake Carriers Ass'n v. Mac-Mullan*, 406 U.S. 498, 92 S.Ct. 1749, 32 L.Ed.2d 257 (1972). Plaintiffs' doubts about the constitutionality of the present Plan, and their opposition to the previous Plan, establish the adverse legal interests of the parties. Although the plaintiffs do not seek invalidation of the present Plan at this time, they may clearly do so at any moment in the future; if successful, such a suit would invalidate the Plan and require a new proposal, a new submission to the State Board of Education, and a new election. Since the 7–4–2 Plan is currently in effect, the threat of such legal action by the plaintiffs creates a controversy of the requisite immediacy. Moreover, the intervenors' towns have a legal right to withdraw from District No. 5 if they act before October, 1979, and a decision on the constitutionality of the Plan would be relevant to the exercise of this right. There is thus no constitutional bar to this Court's exercise of jurisdiction under the Declaratory Judgment Act, 28 U.S.C. § 2201 (1976). See *Technical Tape Corp. v. Minnesota Mining & Manufacturing Co.*, 200 F.2d 876 (2d Cir. 1952).

The second question raised by the plaintiffs—whether a constitutional decision should be avoided on prudential grounds—is a considerably closer one. This is a case of first impression. Since the Supreme Court declared the apportionment of elective state

bodies to be a justiciable issue, *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), the federal courts have confronted an impressive variety of electoral permutations, including voting by geographic region, *Town of Lockport v. Citizens for Community Action at the Local Level, Inc.,* 430 U.S. 259, 97 S.Ct. 1047, 51 L.Ed.2d 313 (1977); *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), special-interest electorates, *Hill v. Stone,* 421 U.S. 289, 95 S.Ct. 1637, 44 L.Ed.2d 172 (1975); *Salyer Land Co. v. Tulare Lake Basin Water Storage District,* 410 U.S. 719, 93 S.Ct. 1224, 35 L.Ed.2d 659 (1973), multimember districts, *Chapman v. Meier,* 420 U.S. 1, 95 S.Ct. 751, 42 L.Ed.2d 766 (1975); *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), and super-majority requirements, *Gordon v. Lance,* 403 U.S. 1, 91 S.Ct. 1889, 29 L.Ed.2d 273 (1970). But there do not appear to be any cases that have considered the constitutionality of a plan that would forbid action by certain defined combinations of elected representatives.

Not only is there a lack of judicial precedent, but there is little certainty about the manner in which the 7–4–2 Plan will operate.[2] The danger it presents is that it would dilute the votes of those voters in the town or towns whose representatives alone comprised a majority on a particular vote, but were unable to act. For example, a proposal supported only by the seven representatives from Orange would be defeated, while a proposal supported by any other combination of seven representatives would be successful, thus diluting the vote of an Orange resident in that circumstance. On the other hand, the Plan's limitation on majority action applies to the representatives of Woodbridge and Bethany in those instances when they alone constitute a ma-

jority. While those from Orange may act only if they secure the support of at least one representative from either of the other towns, those from the other towns may act only if they secure the support of one of the Orange representatives. In practice this arrangement might operate in a fair manner, even though the voters of the largest town can be denied the exercise of their majority position. Without further information about the actual operation of the Plan, it is difficult to determine what its actual effect will be.

Given the lack of prior judicial experience with this type of plan, and the uncertainty about the actual manner in which the Plan will operate, the only remaining basis for judgment would be an evaluation of the Plan on its face. Such an evaluation, however, does not yield a conclusive answer. Because the Plan links the voting power of the Board members to their geographic origin, it cannot be regarded as unquestionably constitutional, as the intervenors urge. In *Gordon v. Lance, supra,* the Supreme Court declared that a super-majority requirement numerically more stringent than the one presented here did not violate the Equal Protection Clause. But the Court based its holding, in part, on the fact that there was no geographic discrimination involved. 403 U.S. at 4–5, 91 S.Ct. 1889. Here, the majorities that will be unable to prevail are defined by the fact that they are comprised of representatives elected from specific geographic entities. Similarly, in *Town of Lockport, supra,* the Supreme Court recognized that different geographical areas could have sufficiently different interests so that their separate agreement could be required without violating the Equal Protection Clause. But the Court clearly indicated that a requirement of this

---

2. At one point in their brief, intervenors observe that the Plan's departure from the one person-one vote standard is *de minimus,* since there is only one voting combination in 1800 that would not be given full effect. Immediately thereafter, however, the intervenors assert that the majority limitation is a crucial one, that would be likely to come into effect in a number of important votes. Brief for Interve-

nors at 4–5. If the limitation is that important, however, it would clearly become relevant far more frequently than the bare statistical computation would predict. Thus, it appears that the intervenors, although they seek a final determination at this time, are themselves uncertain about the role that the limitation will play in the Board's decision-making process.

kind was appropriate for popular referenda on discrete issues, and not where representatives are sent to a legislative body to vote on a variety of matters. 430 U.S. at 266, 97 S.Ct. 1047. In the present case, the approval of the Plan by the three towns is the sort of referendum to which the Court referred. But the voters are now sending their representatives to a legislative body, though one with a limited subject matter, and it is certainly arguable that they should be sent with equal voting power.

But it is difficult to conclude that the 7–4–2 Plan is unconstitutional on its face. A recurring theme in reapportionment cases has been the unconstitutionality of placing one identifiable group at a permanent disadvantage in the legislative process. See *Hill v. Stone, supra; Reynolds v. Sims, supra.* Where there has been an indication of racial bias, scrutiny has been particularly strict, and even generally acceptable apportionment procedures have been deemed invalid in such circumstances. See *White v. Regester, supra* (multi-member districts); *Gomillion v. Lightfoot,* 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960). In *Gordon v. Lance, supra,* the Supreme Court explained its distinction between acceptable and unacceptable super-majorities by stating: "so long as such provisions do not discriminate against or authorize discrimination against any identifiable class they do not violate the Equal Protection Clause." 403 U.S. at 7, 91 S.Ct. at 1892 (footnote omitted). See *Burns v. Richardson,* 384 U.S. 73, 88–89, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966).[3] Here, there is no clear indication that any particular group would be discriminated against, or placed at a

permanent disadvantage by the Plan. Neither the representatives of the largest town, nor those of the two smaller towns, can act without the concurrence of at least one member of the other group. While this provision will operate against the interests of the largest town in some circumstances, it will benefit that town's interests whenever two of its representatives are absent and the representatives of the other two towns could otherwise prevail. Subtle strategic considerations among all the members might distribute the effects of the provision through a still broader range of situations. Moreover, there is no suggestion in the present or previous record of this case that racial motivations have been involved in the apportionment process. The Plan appears to be a conscientious effort to comply with constitutional requirements while providing sufficient checks on majority action to obtain the Plan's approval by voters in all of the constituent towns. Strict mathematical equality is not required, since good faith has been indicated in the apportionment process. This is particularly true for state and local bodies, where more flexibility is constitutionally permissible due to the interest in the normal functioning of these institutions. *Mahan v. Howell,* 410 U.S. 315, 321–30, 93 S.Ct. 979, 35 L.Ed.2d 320 *modified,* 411 U.S. 922, 93 S.Ct. 1475, 36 L.Ed.2d 316 (1973); *Abate v. Mundt,* 403 U.S. 182, 91 S.Ct. 1904, 29 L.Ed.2d 399 (1971).

In short, the constitutionality of the 7–4–2 Plan is best determined once the Plan has been in operation for a period of time. Future events might reveal a pattern

---

**3.** Another group of cases that could conceivably shed light on this issue are the lower court cases involving county distribution rules in the nominating or popular initiative process. These rules provide that a candidate or a proposition cannot be placed on the ballot unless a certain number of the signatures required are obtained from each county or district in the state. Several such rules have been struck down when large population discrepancies among the counties or districts were involved, and when the effect was absolutely to bar a particular candidate. *See Socialist Workers Party v. Rockefeller,* 314 F.Supp. 984 (S.D.N.

Y.), *aff'd,* 400 U.S. 806, 91 S.Ct. 65, 27 L.Ed.2d 38 (1970). But when the population discrepancies have been small, or only a referendum issue was involved, the distribution rules have been upheld. *See Massachusetts Public Interest Research Group v. Secretary of Commonwealth,* 375 N.E.2d 1175 (Mass.1978); *Moritt v. Governor of New York,* 42 N.Y.2d 347, 397 N.Y.S.2d 929, 366 N.E.2d 1285 (1977), *appeal dismissed,* 434 U.S. 1029, 98 S.Ct. 758, 54 L.Ed.2d 777 (1978). Thus, the county distribution rule cases do not provide any clear guidance for the present issue.

of discrimination that would render the plan invalid. Should the Plan's majority limitation provision lead to the constant frustration of the same majority of members present and voting, whether that majority were composed of the representatives of Orange, or the representatives of Woodbridge and Bethany, invalidation on constitutional grounds might well follow. The Supreme Court has recognized in the residence plan cases that a plan potentially unconstitutional in operation can survive a challenge at least until its infirmity is demonstrated in practice. *Dallas County v. Reese,* 421 U.S. 477, 95 S.Ct. 1706, 44 L.Ed.2d 312 (1975); *Dusch v. Davis,* 387 U.S. 112, 87 S.Ct. 1554, 18 L.Ed.2d 656 (1967); *Fortson v. Dorsey,* 379 U.S. 433, 438–39, 85 S.Ct. 498, 13 L.Ed.2d 401 (1965). On the other hand, the Plan might operate in an equitable manner that renders the power of each voter in all three towns substantially equivalent, because the majority limitation provision either is rarely invoked or operates against the Orange representatives not significantly more often than against the Woodbridge and Bethany representatives. A conclusive determination at this time would be inappropriate. Even with coercive actions or obligatory review, decisions may be deferred on prudential grounds. See *California Bankers Association v. Shultz,* 416 U.S. 21, 94 S.Ct. 1494, 39 L.Ed.2d 812 (1974); *Rescue Army v. Municipal Court,* 331 U.S. 549, 67 S.Ct. 1409, 91 L.Ed. 1666 (1947). Declaratory judgment is always a matter of the court's discretion, and it would seem particularly appropriate to defer such a declaration when persuasive prudential factors are involved.[4] Intervenors' request for a declaratory judgment is therefore denied. This Court had retained jurisdiction after its previous decision "so

that plaintiffs may reapply for interim relief." 432 F.Supp. 542. Since plaintiffs presently make no claim for court-ordered relief and a plan is currently in effect, that jurisdiction is now terminated, without prejudice to a future lawsuit in the event the operation of the Plan is alleged to effect the denial of a constitutionally protected right.

---

4. Intervenors also urge a decision on the ground that their two towns' ability to withdraw from District No. 5 as of right pursuant to Public Act 77–352 will expire in a few months. They concede, however, that this would be an "extreme option," and present no evidence that it is being seriously considered by either of the two towns. (Withdrawal was apparently considered by plaintiffs' town, Orange, during 1977). While the impending loss of this possibility may be sufficient to fulfill the case or

controversy requirement, it is not enough to overcome the prudential considerations involved in deferring a decision. Such a decision would either give this Court's approval to a plan potentially unconstitutional in operation or invalidate a plan that may function fairly in practice. Either of these possibilities would be far more serious than the denial of relevant information for an option that the two towns are unlikely to exercise.